[Sac. No. 7006. In Bank. Nov. 17, 1959.]

VINCENT J. HORTON, Appellant, v. NORVIN R. KYBURZ, Respondent.

Rowland & Paras and George E. Paras for Appellant.

Brandenburger, White & Dillon and William A. White for Respondent.

SCHAUER, J.—In this action to have defendant declared the constructive trustee for plaintiff of an undivided one half interest in real property, plaintiff appeals from a judgment which decrees that he has no interest in such property. Plaintiff alleged and the trial court found facts sufficient to raise a constructive trust under the view of *Notten* v. *Mensing* (1935), 3 Cal.2d 469, 473-477 [1-6] [45 P.2d 198], and *Ryan* v. *Welte* (1948), 87 Cal.App.2d 897, 901-903 [4-6] [198 P.2d 357] ; i.e., plaintiff's father and stepmother orally agreed that all their property would go to the survivor for life and that the survivor would will such property one half to plaintiff and one half to those relatives of the stepmother whom she chose; in reliance on the oral agreement the spouses put their property in joint tenancy and plaintiff's father forbore to make any testamentary or other disposition of his property to members of his own family which would have been effective in the event the stepmother survived him, which she did; the stepmother took the subject realty as surviving joint tenant, conveyed it to herself and defendant, her relative, as joint tenants, and on her death defendant took as surviving joint tenant. But defendant alleged and the trial court found that he gave "good and valuable consideration" for the conveyance and took as a bona fide purchaser.[1]

Plaintiff urges that as a matter of law defendant is not a bona fide purchaser because (1) there is no evidence that he gave consideration adequate to cut off plaintiff's equity, because (2) the evidence establishes that defendant took with constructive notice of plaintiff's equity, and because (3) there was no agreement between defendant and plaintiff's step-

---

[1]In a second cause of action plaintiff sought a declaration that defendant is constructive trustee of an undivided one half interest in other real property as to which defendant was the surviving joint tenant of plaintiff's stepmother. The trial court found that the stepmother acquired such property after the death of her husband (plaintiff's father), and that she did not acquire it with funds which had been owned by her or her husband during their marriage. Plaintiff does not urge a reversal of the judgment for defendant as to this second cause of action.

mother that defendant would receive *all* the subject property on her death but rather defendant alleged and the trial court found that defendant gave "good and valuable consideration" for the agreement of plaintiff's stepmother to convey "a joint tenancy interest" which, plaintiff asserts, is only a one half interest. Plaintiff also contends that the trial court erred (4) in admitting, over objection, evidence of assertedly "self-serving" oral declarations of plaintiff's deceased stepmother, (5) in admitting, over objection, the will of plaintiff's step-mother, which states that she devises her entire estate to defendant, and (6) in rejecting evidence of the value of the subject realty shortly before the institution of this action, offered on the issue of adequacy of the consideration given by defendant.

We have concluded that plaintiff's contentions, considered (as they must be) on the basis of facts found by the trial court from conflicting evidence, do not impel reversal.

Plaintiff is the son of Robert and Annie Horton, who were divorced prior to 1916. In 1916 Robert married Elizabeth. They remained married until Robert's death in 1931. There was no issue of their marriage. Robert throughout his life had a close and affectionate relationship with plaintiff, and plaintiff often visited Robert and Elizabeth in their home.

In 1930 Robert and Elizabeth purchased and took up residence on the subject property, a ranch of 223 acres. During their marriage they had orally agreed that all property owned by either of them would go to the survivor for life and the survivor on his or her death would will such property one half to plaintiff and one half to those relatives of Elizabeth whom she might select.[2] In reliance on their oral agreement they put all their property, including the subject ranch, in joint tenancy and Robert made no will or other disposition

[2]The evidence of this oral agreement is as follows: Plaintiff testified that on January 18, 1931, the day following his father's death, plaintiff and his wife, at Elizabeth's request, called at the home of plaintiff's aunt and uncle (Robert's brother) where Elizabeth was visiting. There Elizabeth told plaintiff, in the presence of his wife, aunt, and uncle, that "The reason I wanted to see you was, your father and I had an agreement that if he died first, I was to have the use of all the property until I died; and then it was to be divided to—his half was to go to you, and I could leave my half to anyone I wished, on my side of the family. ... Now, it won't do you any good to start any trouble, because all the property is in joint tenancy, and that is the way it is going to be." Plaintiff's wife, uncle, and aunt gave substantially similar testimony. Also plaintiff, his wife, and his aunt each testified that Robert, prior to his death, had made statements ·to the effect that "I am going to give this ranch to Vincent [plaintiff] when I die."

of his property to any members of his own family in the event Elizabeth should survive him. On February 18, 1930, he made a will which would have devised the entire ranch to plaintiff if Elizabeth had predeceased Robert.[3]

Defendant is Elizabeth's grandnephew. She took defendant into her home in 1932, when he was four years old, and their relationship was similar to that of mother and son.

From the time of Robert's death until 1949 Elizabeth leased the ranch for grazing purposes for $125 a year. In 1948 Elizabeth sold 63 acres of the ranch to the United States government for $50 an acre.

On February 15, 1954, without plaintiff's knowledge Elizabeth conveyed the ranch to defendant and herself as joint tenants. She caused this deed to be recorded on February 19, 1954. The trial court found ''That said conveyance . . . was made for good and valuable consideration in that prior to 1954 [''About the end of '49'' and ''Quite a few times'' thereafter, according to defendant's testimony] said Elizabeth A. Horton informed defendant, Norvin R. Kyburz, that if said Norvin R. Kyburz would maintain and improve said real property during the lifetime of said Elizabeth A. Horton that she would convey to him a joint tenancy interest in said real property; that for more than seven (7) years prior to the death of said Elizabeth A. Horton on October 11, 1956, said Norvin R. Kyburz did improve and maintain said property[4]. . . . That at no time prior to the filing of the plaintiff's complaint herein did . . . defendant, have any knowledge that said plaintiff claimed any right, title or interest in and to said real property . . . That defendant . . . is a *bona fide* purchaser of said real property . . . and to enforce against said defendant the oral agreement made and entered into between [Robert and Elizabeth] . . . would be harsh, oppressive and unjust.''

---

[3]The provisions of the will were as follows: It bequeathed $5.00 each to three named sibs of plaintiff, issue of Robert's prior marriage to Annie; it devised the ranch to Elizabeth, ''But should she pre-decease me, then I bequeath the ranch property to [plaintiff]''; and it bequeathed all other property to Elizabeth.

[4]Defendant testified that before 1949 he had done some work in maintaining and repairing the ranch property and other property of Elizabeth; that ''About the end of '49 [when defendant was 21 years of age] she said if I would continue helping her with her maintaining her places and the ranch, she would leave them to me''; that thereafter Elizabeth repeated the substance of this statement ''Quite a few times'' and defendant from time to time worked on Elizabeth's property and contributed some of his money to its improvement and maintenance; that in 1954 ''She told me as long as I was putting part of my money

*Sufficiency of Consideration paid by Defendant to Elizabeth.* Plaintiff urges that because "This entire proceeding is one in equity and involving equitable considerations" defendant, to establish his position as bona fide purchaser, must show not merely that he gave value for the conveyance but that he gave "adequate consideration" in the sense that such adequacy is necessary to obtain specific performance of a contract. To uphold this contention would appear to contravene rules of contract and real property law long established in this state. When the Legislature in 1872 enacted as code law the familiar rule (Civ. Code, § 3391) that "Specific performance cannot be enforced against a party to a contract . . . 1. If he has not received an *adequate* consideration for the contract . . ." (italics added) it also dealt with subjects pertinent to the present action by enacting the following rules:

"No implied or resulting trust can prejudice the rights of a purchaser . . . of real property for value and without notice of the trust." (Civ. Code, § 856.)

"Any benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise." (Civ. Code, § 1605.) ▓▓ The term "good consideration" in section 1605 is equivalent to the term "valuable consideration." (*Aden* v. *City of Vallejo* (1903), 139 Cal. 165, 168 [72 P. 905], rejecting the earlier view, expressed in *Clark* v. *Troy* (1862), 20 Cal. 219, 224, that "A good consideration is such as that of blood, or of natural affection. A valuable consideration is such as money or the like.") The Clark case refused to accept the contention, similar to that advanced by the present plaintiff, that the expression "valuable consideration"

---

in on the ranch that she would protect me too, that she would give me a joint tenancy deed and that is when she went to Judge Mundt."

Judge Albert H. Mundt testified that in 1954, while he was engaged in the private practice of law, Elizabeth asked him to draw a joint tenancy deed of the ranch to herself and defendant; that "I suggested to her that it would not be in her best interest to do so in that it was taking control of the property from her and putting it at least partially in control of her nephew. She informed me at that time that she not only wanted to do so but was obligated to do so because she had agreed with him previously that if he would assist her and maintain that property and other properties that she would convey the property to him in joint tenancy and upon her death he would get all of it. And she told me that he had complied with his agreement and that he had done certain work the nature and extent of which I do not recall."

in the former Conveyancing Act did not mean "only that amount of money, or its equivalent, which would support a contract at common law—that is, one dime or one cent" but rather meant "such a consideration as would support an executory contract in a Court of Equity" (p. 222 of 20 Cal.), and held that "The inadequacy of price is a circumstance proper to be considered in determining the question of good faith, but it will not the less fall within the legal definition of a valuable consideration, however disproportionate it may be to the value of the land" (p. 224 of 20 Cal.).

This remained the rule under the 1872 enactment of section 1107 of the Civil Code, which provides that "Every grant of an estate in real property is conclusive against the grantor, also against everyone subsequently claiming under him, except a purchaser . . . who in good faith and for a valuable consideration acquires a title . . . by an instrument that is first duly recorded." (See Civ. Code, § 5; *Cain* v. *Richmond* (1932), 126 Cal.App. 254, 260 [6, 7] [14 P.2d 546]; *cf. United States* v. *Certain Parcels of Land* (1949, U.S. Dist.Ct., S.D. Cal., C.D.), 85 F.Supp. 986, 1006, footnote 17.)

█ It has been pointed out that "The recording laws were not enacted to protect those whose ignorance of the title is deliberate and intentional, nor does a mere nominal consideration satisfy the requirement that a valuable consideration must be paid. Their purpose is to protect those who honestly believe they are acquiring a good title, and who invest some substantial sum in reliance on that belief." (*Beach* v. *Faust* (1935), 2 Cal.2d 290, 292 [1] [40 P.2d 822].) But here there is evidence that defendant gave more than "mere nominal consideration." He testified that he and Elizabeth did the following work on the ranch: "Well, we fixed the fences. We put in the northeast fence which was about a little over a quarter of a mile, and I built the northwest fence. It is about a quarter of a mile, about ready to fall down, and a couple of cross fences. We had three wells drilled. We paid fifty per cent apiece . . . on the wells. Put an aluminum roof on the barn and jacked it up and poured a foundation on the north end of it and pillars through the middle and through the south end. We run water to the corral and across the road; put in pressure pumps and separator house. We knocked the front of it off and rebuilt that, reroofed it; put a foundation in the front of it and put a cement floor in it. We built a three-car garage out of aluminum; and the clearing of the land and the reservoir around the hill; and the seeding of

the south side; and there is about an acre of permanent pasture besides the brush clearing and burning and stuff that we had done before that." Defendant paid for half the roofing and half the cost of bulldozers to clear part of the land. He bought the seed, pump, and sprinkler pipe for the permanent pasture. The clearing of brush and repair of fences was done prior to 1949. The wells were drilled in 1954 and 1955. The record is silent as to just when the rest of the work was done, but it can be inferred that it was after 1949 because from the time of Robert's death until 1949 Elizabeth "leased [the ranch] out for cattle grazing," and after 1949 defendant "started running stock on it."

Plaintiff argues that defendant could have done little work on the ranch after the making of the 1949 agreement because from September, 1949, until September, 1953, he was in the armed services and thereafter he worked full time at various jobs. These circumstances were for the appraisal of the trier of fact; they do not show as a matter of law that defendant's contribution to the maintenance and improvement of the realty was barely nominal. Plaintiff further argues that work of defendant done after the 1954 conveyance by Elizabeth to herself and defendant as joint tenants could not have been consideration for such conveyance since defendant was coowner of the property. But the consideration for which Elizabeth bargained and which defendant gave was *continued* help in maintaining the property, not help merely until Elizabeth should convey a legal interest in the property to defendant.

Also pertinent to the subject of consideration is plaintiff's attack on the trial court's refusal to admit evidence that in 1956, shortly after Elizabeth's death and shortly before the institution of this action, defendant agreed to sell the ranch (then reduced to 160 acres) for $950 an acre. The trial court took the position that evidence of value in 1956 was not relevant. It appears that evidence of the value of the property in 1956, when defendant received full legal title as surviving joint tenant, would be relevant to the question of "inadequacy of price [which] is a circumstance proper to be considered in determining the question of good faith" necessary to constitute defendant a bona fide purchaser (*Clark* v. *Troy* (1862), *supra*, 20 Cal. 219, 224), but that exclusion of the evidence was not prejudicial because had it been received it would have required interpretation by other evidence to connect it controllingly with value in 1954 (when Elizabeth executed the

joint tenancy deed to herself and defendant). Furthermore, insofar as relates to the reasonableness of the original oral offer made by Elizabeth to defendant in 1949, the value in 1956 would be entitled to little, if any, weight. It will be recalled that there was evidence that in 1949 Elizabeth ceased to rent the ranch (then comprising 223 acres) for $125 a year and sold 63 acres of it to the United States government for $50 an acre. This 63 acres apparently had some connection, not adequately explained, with construction of Folsom Dam. The finding of the trial court, as hereinabove mentioned, is that "prior to 1954 said Elizabeth . . . informed defendant . . . that if [defendant] . . . would maintain and improve said real property during the lifetime of said Elizabeth A. Horton that she would convey to him a joint tenancy interest in said real property; that for more than seven (7) years prior to the death of said Elizabeth A. Horton on October 11, 1956, said Norvin R. Kyburz did improve and maintain said property."

Concerning the value of the ranch the following may also be mentioned: In the course of a colloquy as to admissibility of evidence of its value in 1956, defendant's counsel remarked, "the court may well take judicial notice of the fact that in this particular area that we are concerned here with that there has been a vast increase in property values owing to Folsom dam being erected or construction there and in the past six or seven years." The court replied, "Yes, what I had in mind when I was inquiring of Mr. Paras [plaintiff's counsel], value ——" and Mr. Paras interjected a comment on the consideration allegedly given by defendant. From the foregoing colloquy it is not apparent whether the court felt that it could take judicial notice of the rising value of the ranch for its bearing on defendant's good faith, but it does at least appear that the matter was brought to its attention.

■ Plaintiff cites *Bank of Ukiah* v. *Gibson* (1895), 109 Cal. 197, 200 [41 P. 1008], for the proposition that a mere promise of the purchaser is not value within the rule which protects a bona fide purchaser. The proposition is generally sound (*Davis* v. *Ward* (1895), 109 Cal. 186, 189-190 [41 P. 1010, 50 Am.St.Rep. 29]; Rest., Trusts 2d (1959), § 302) but it does not necessarily control the factual situation here. At the time of plaintiff's attack on the conveyance, the contract was fully executed; any implied promise of the purchaser-defendant to render services and assist in maintaining the ranch had been performed; at least some services had been

rendered which were accepted by Elizabeth as full performance.

██ *Evidence Assertedly Establishing that Defendant was Put on Notice of Plaintiff's Claim.* Plaintiff urges that the following testimony of defendant shows that defendant had constructive notice of plaintiff's interest, i.e., that defendant had "actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact" and "by prosecuting such inquiry, he might have learned such fact" (Civ. Code, § 19):

"Q. Norvin, during the time that you lived with your aunt [great aunt Elizabeth], did your aunt ever say anything to you about . . . plaintiff Vincent Horton getting any of her property? A. No, sir . . .

"Q. Did you ever have any conversation with her concerning the possibility of his coming in on any of the property? A. Between '55 and '56 she brought it up one day that if anything happened to her that she didn't want my mother or her sister to come in on it, on the will or anything. And I brought it up about did she think that Vincent would ever try to come in.

"Q. I see. You asked her if she thought that Vincent would ever come in? A. Yes, sir.

"Q. What was her answer? A. She didn't think he would. . . .

"Q. May I ask why you asked that question? A. Because Vincent was the only one on the other side that I thought would have anything to say about it or—well, that is the only one we ever saw.

"Q. Can you tell me what made you think that he might have anything to say about it? A. No, I don't—he was the only one I could think of.

"Q. Just occurred to you to ask that question about Vincent, is that correct? A. Well, it came up that spur of the moment. It was over ——

"Q. You brought it up? A. I brought it up about Vincent but she started about the other party.

"Q. Was this after 1953 when you had this conversation? A. '53? It was '49.

"Q. This conversation concerning Vincent was in '49? A. Oh, '55 and '56.

"Q. '55 and '56? A. Yes, sir.

"Q. I see. It was after your father had died? A. He died in '53.

"Q. You indicated that he died in '53 and this conversation took place afterwards? A. '55, yes, sir.

"Q. And is that the only conversation you ever had with your aunt concerning Vincent Horton? A. Yes."

The foregoing conversation held after Elizabeth had executed and caused recordation of the joint tenancy deed to herself and defendant in 1954, and after defendant had furnished some consideration for the conveyance, does not as a matter of law show that defendant was put on notice of plaintiff's equitable claim. It shows that defendant was concerned with the possibility that plaintiff might assert some claim but neither the conversation alone nor the conversation coupled with the rather small and indefinite, but valuable, consideration which defendant gave for the ranch shows that defendant deliberately remained ignorant of a state of facts as to which he should have been put on notice.

*Plaintiff's Claim that Defendant was at Most a Bona Fide Purchaser of a One Half Interest in the Ranch.* Defendant alleged and the trial court found that prior to 1954 Elizabeth agreed that if defendant would maintain and improve the ranch "she would convey to him a joint tenancy interest in said real property." Since "A joint interest is one owned by two or more persons in equal shares . . ." (Civ. Code, § 683) plaintiff argues that under the agreement between Elizabeth and defendant Elizabeth undertook to convey and defendant gave consideration for only a one-half interest in the ranch; plaintiff says that Elizabeth did not agree not to sever the joint tenancy and urges that the joint tenancy deed did not convey to defendant the one-half interest which Elizabeth had orally agreed with Robert was to go to plaintiff.

█ Judge Mundt, however, testified that when (in 1954) Elizabeth asked him to prepare the joint tenancy deed she said that she had agreed with defendant "that she would convey the property to him in joint tenancy and upon her death he would get all of it" and defendant testified that Elizabeth said "if I would continue helping her with her maintaining her places and the ranch, she would leave them to me." The foregoing testimony supports the view that defendant gave consideration for Elizabeth's promise not merely to put the ranch in joint tenancy with defendant but also to leave it in joint tenancy so that the right of survivorship would operate. The trial court stated that "I think everyone has been telling the truth in the case . . . I believe all the folks in the case." █ It is apparent that the case was

tried on the theory that defendant claimed as bona fide purchaser of the entire interest in the ranch, and that if the trial court had specifically found concerning the present contention of plaintiff its finding would have been adverse to plaintiff and in accord with the above quoted testimony of Judge Mundt and defendant. Therefore, under familiar rules of appellate review, we must reject plaintiff's argument that the judgment decreeing that defendant is the owner of the ranch and plaintiff has no interest in it is not supported by the allegation and finding that Elizabeth agreed to convey to defendant a joint tenancy interest. (*Buckley* v. *Chadwick* (1955), 45 Cal.2d 183, 188 [1] [288 P.2d 12, 289 P.2d 242]; *McClure* v. *Donovan* (1949), 33 Cal.2d 717, 731 [12] [205 P.2d 17]; *Johndrow* v. *Thomas* (1947), 31 Cal.2d 202, 205 [2], 207 [5], 208 [7] [187 P.2d 681]; *Miller* v. *Ambassador Park Syndicate* (1932), 121 Cal.App. 92, 97 [4] [9 P.2d 267].)

 *Admissibility of Evidence of Elizabeth's Oral Declarations and Will.* Defendant urges that the above quoted declarations of Elizabeth to defendant and Judge Mundt, and her will dated November 16, 1954, are inadmissible because they were "self-serving" and enabled her to manufacture a bona fide purchaser defense for defendant. The oral declarations must, in accord with our duty to indulge every reasonable inference and permissible presumption in favor of sustaining the trial court, be regarded as declarations against the declarant's interest, evidencing her undertaking not to have free right to dispose of property to which she had legal title. They are hearsay declarations which serve defendant's interest, of course, but they are admissible and could be accepted by the trial court as "verbal acts" constituting part of the transaction in which Elizabeth agreed to and did convey to defendant, and relevant to show the reason for the conveyance and what Elizabeth intended to accomplish by it. (*Orella* v. *Johnson* (1952), 38 Cal.2d 693, 696 [2] [242 P.2d 5]; *Sethman* v. *Bulkley* (1937), 9 Cal.2d 21, 24 [2] [68 P.2d 961].) The facts of the Orella case (which holds admissible evidence of a conversation which resulted in execution of a deed) and the Sethman case (which holds admissible evidence of a letter written on the date of transfers of property) show that plaintiff is mistaken in his contention that such "verbal acts" must be spontaneous declarations, not a narrative for the purpose of the declarant-transferor; a

similar contention was advanced in the dissenting opinion in the Sethman case, page 27 of 9 Cal.2d.

The will of Elizabeth was properly received upon the issue whether there was an agreement between Elizabeth and Robert that the survivor of them would leave half the property accumulated during their marriage to plaintiff; the fact that Elizabeth made a disposition contrary to the alleged agreement could be considered as tending to disprove the existence of such agreement. (See *Frazure* v. *Fitzpatrick* (1943), 21 Cal.2d 851, 857-858 [6] [136 P.2d 566].)

While on the record it may seem to some of us that, were we triers of fact, we might have reached findings differing in some respect from those declared by the trial judge, we recognize that we did not see and hear the witnesses and, hence, on conflicting evidence have neither right nor power to disagree with the trier of fact.

For the reasons above stated the judgment is affirmed.

Gibson, C. J., Traynor, J., Spence, J., McComb, J., Peters, J., and White, J., concurred.