In the Matter of David SUSSMAN and Charles Sussman, individually, and as co-partners, trading as Charles Company, Bankrupts.

No. 24738.

United States District Court
E. D. Pennsylvania.
July 21, 1960.

Herman N. Silver, Philadelphia, Pa., for bankrupts.

Goff & Rubin, Dennis, Lichtenstein, Cohen & Dennis, Philadelphia, Pa., for trustees.

GANEY, Chief Judge.

This matter is before us on a certificate to review the Referee's order directing the trustees to turn over to one of the bankrupts and his wife $6,095 less a reasonable fee for the trustees and their counsel. The money represents a fund derived from the application of the carryback provisions of the Internal Revenue Code of 1954.

David and Charles Sussman, residents of Pennsylvania, conducted a partnership as co-partners under the name Charles Company. For the calendar year 1954, each of the partners filed a joint income tax return with his wife. As a result David and his wife, Annette, determined their tax liability to be $4,390.66, while Charles and his wife, Marcia, figured theirs to be $4,798.66. The fiscal year of the partnership as well as the two couples was the calendar year. In their joint returns for the year 1955, each couple determined that they owed $4,648.55 in income taxes.[1]

In the first five months of 1956, the partnership suffered heavy losses. Upon its failure to effect a settlement with its creditors, David and Charles Sussman both individually and as co-partners, trading as Charles Company, filed an involuntary petition in bankruptcy on June 7, 1956, and they along with the partnership were adjudicated bankrupts.

On March 12, 1957, the trustees in bankruptcy, without authority from David and his wife or Charles and his wife, filed an application for a tentative carryback adjustment on Form 1045, pursuant to § 5411 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 5411, on behalf of the bankrupt partners for payment of all or a portion of the income taxes paid in the joint returns filed by the partners and their respective wives for the calendar years 1954 and 1955. The application listed a net operating loss in excess of $124,000 for the period January 1, to June 6, 1956, inclusive. This loss when distributed between the partners was more than enough to wipe out all the gains reported in the joint returns for the years 1954 and 1955. Neither the bankrupt partners nor their respective wives signed the application.

In July of 1957, the Department of Internal Revenue, after making a limited examination, approved the application under § 6411(b) of the Code, 26 U.S.C.A. § 6411(b)[2] and sent checks totaling $14,202.59, representing payments resulting from the application of the carry-back provisions of the Code for the years 1954 and 1955 on the joint returns filed by David and his wife and Charles and his wife. On June 22, 1958, the bankrupt partners and their respective wives filed a petition to show cause why the trustees should not turn the $14,202.59 over to them.

---

1. The record before us does not disclose that the wives reported any income for the years 1954 and 1955.

2. This section is sometimes referred to as the "quick refund" provision of the Code.

In October of 1958, the Department of Revenue, upon auditing the 1954 and 1955 returns of each of the partners and his wife, determined that the trustees were not entitled to any payment based on the tax returns of David and his wife and as a consequence had made an overpayment of $8,107.59, and that the remaining $6,095 was based on the returns filed by Charles and his wife. The Department therefore filed a petition to show cause why the $8,107.59 should not be returned to the Government. The trustees agreed with the Department and the Referee entered an order returning that amount to the United States Treasury.

On January 23, 1959, the Referee ruled on the rule to show cause filed on June 22, 1958, and signed an order directing the trustees to turn over to Charles Sussman and his wife the sum of $6,095 "less a reasonable fee to the trustee and his counsel to be determined by the Referee when and if the order became final."

■ The Bankruptcy Act [3] and, for certain purposes, the law of Pennsylvania,[4] recognize a partnership as a business entity. However, the Internal Revenue Code of 1954, as amended, considers a partnership a bookkeeping arrangement from which the individual partners may ascertain their respective distributive share of the profits of the partnership,[5] and even though the Code permits each partner to take his proportionate share of the partnership losses into account in computing his own losses and net operating losses, the partnership is not liable for the payment of an income tax. It cannot take advantage of the carry-back and carry-forward features

of the Code. If title to the $6,095 payment vested in the trustees at the time of bankruptcy, it is because Charles Sussman in his individual capacity joined in the bankruptcy petition.[6]

Section 70 of the Bankruptcy Act, 11 U.S.C.A. § 110, tells us what property of a bankrupt shall vest in the trustee. This section, after stating that the trustee of a bankrupt estate shall be "vested by operation of law with the title of the bankrupt as of the date of the filing of the petition initiating a proceeding under this Act, except insofar as it is to property which is held to be exempt," goes on to mention the kinds of property of the bankrupt which are included. With certain exceptions which are clearly not relevant here, one of the legal attributes of the kinds of property referred to is that it must be vested in the bankrupt as of the date of the filing of the petition; if the property in question is an estate or interest by the entirety, then all or part of such property or interest must become transferable by the bankrupt within six months after the petition is filed.

■ The property at stake is the fund realized from applying the net operating loss and carry-back provisions of § 172 of the Code, 26 U.S.C.A. § 172, to sums reported in the income tax returns of Charles and his wife. Leaving aside the question of what kind of property is the right to apply the provisions of § 172, and assuming that Charles was single at the date of bankruptcy, let us first ascertain when it came into existence.[7] Section 172(c) defines "net operating loss" to mean "the excess of the deductions allowed by this chapter over the

---

3. See § 5 of the Bankruptcy Act, 11 U.S. C.A. § 23; 1 Colliers on Bankruptcy (14th Ed.) Para. 5.03.

4. In re Morrison's Estate, 1942, 343 Pa. 157, 162, 22 A.2d 729.

5. See §§ 701 and 703(a) of the Internal Revenue Code of 1954, 26 U.S.C.A. §§ 701, 703(a).

6. The Referee put it this way: "If it comes into the estate at all, it comes to the trustees as trustees of the bankrupt individual partner and they would be

required to apply the fund first to the payment of the individual's debts before partnership creditors would get anything [from the fund]."

7. The problem is not one of consulting federal or state law to the exclusion of the other. See the case of Matter of Halprin, 3 Cir., 280 F.2d 407, where our Court of Appeals, speaking through Circuit Judge Hastie, skillfully identified the property right involved and tracked down its owner.

gross income." Therefore, by definition, the net operating loss cannot be determined for any one year until the gross income for that year has been ascertained. Since Charles filed returns on the calendar basis, the net operating loss deduction for 1957 could not be determined until his entire gross income for that year could be taken into account. As of the date of bankruptcy, the bankrupt partners showed a loss, and if that loss would continue until the end of the year, a situation would exist whereby the carry-back provisions of the Code could be brought into play. But there was a possibility at the time of the petition that Charles would earn enough taxable income before the end of the year to have diminished or wiped out his proportionate share of the partnership loss sustained in 1956. If the latter were the case, there would have been no fund to litigate over. Moreover, § 6411 of the Code,[8] pursuant to which the trustees filed the application for a tentative carry-back adjustment, provides that the application "shall be filed on or after the date of filing of the return for the taxable year of the net operating loss from which the carryback results and within a period of 12 months from the end of such taxable year." Thus the earliest date that such application could have been filed in this case by or on behalf of Charles was January 2, 1957, which date was more than six months from the date the petition was filed. Of course the application must be approved before payment will be made. So whatever property label is given to the right to file an application for a tentative carry-back adjustment, the right was not vested in Charles at the time the petition was filed and did not become transferable or assignable by him within the six-month period after bankruptcy. Since the right did not measure up to any of the kinds of property set forth in § 70 of the Bankruptcy Act, it could not vest in the trustees in bankruptcy.

This conclusion should not be weakened because Charles was married and filed joint income tax returns with his wife for the years 1954 and 1955. As a matter of fact, this situation is given by the Referee as his primary reason for awarding the $6,095 to them. On pages 3 and 4 of his opinion the Referee said: "When the tax was paid by the husband and wife, that part of the husband's money that was used to pay the tax was held by them by entireties and [the] chose in action which arose against the government by reason of the carryback provisions of the Internal Revenue Code was consequently held by them as tenants by entireties." Moral support for this view comes from a not too distant source. The Court of Common Pleas of York County, Pennsylvania, in holding that an assignee of an insolvent partnership is not entitled to the "refund" paid by the Department of Internal Revenue pursuant to the carry-back features of the 1954 Code to each of the individual partners and their respective wives for taxes paid for 1954 and 1955, as the result of a loss sustained during the year 1956, said: "There is also merit to the assertion that the refund under the circumstances here involved constitutes an estate by the entireties and consequently may not be reached or acquired by the assignee. In a well reasoned opinion in Green Estate, 1958, 14 Pa. Dist. & Co. R. 2d 595, Judge Bolger, of the Orphans' Court of Philadelphia County, comes to that conclusion in holding that a refund of overpayment of income tax on a joint return of husband and wife received after the husband's death, belongs entirely to the wife as surviving tenant by the entireties. * * *" See York Radio and Refrigeration Parts, 1959, 20

---

8. The last sentence of subsection (a) to this section states: "An application under this section shall not constitute a claim for credit or refund." Hence, a situation where an application is filed pursuant to § 6411 should not be confused with cases in which a claim for credit or refund on taxes erroneously or improvidently paid in whole or in part by the bankrupt before bankruptcy. For examples of the latter, see Chandler v. Nathans, 3 Cir., 1925, 6 F.2d 725; In the Matter of Paul Illingworth, 56–2 U.S. Tax Cases, Para. 10,004 (D.C.Or.1956).

**324**

Pa.Dist. & Co. R.2d 85, 88. There is some basis in the Code for this view. Under §§ 6013(d) (3) and 6013(a), 26 U.S.C.A. § 6013(a), (d) (3), a husband and wife are made jointly and severally liable for the tax when they file a joint income tax return even though one of the spouses has neither gross income nor deductions. Nevertheless we do not deem it necessary to rest our conclusion on the "tenants by the entireties" theory.

The most favorable argument that can be advanced on behalf of the trustees is that at the time the petition in bankruptcy was filed it seemed unlikely that Charles, his wife, or both of them together could earn enough income between June 7, 1956, and January 1, 1957, to erase Charles' share of the bankrupt partnership's loss for 1956. Hence it was almost a certainty that Charles' right to derive some benefit from applying the carry-back provisions of the Code in 1957, and the only question remaining would be the determination of the amount of the benefit. However, this argument presumes that the trustees have a right to file a separate return or an application for a tentative carry-back adjustment in 1957 on behalf of Charles or to require him to do so.

We are not insensitive to the fact that the awarding of the fund to Charles and his wife is unfair to the creditors of Charles. But inequitable situations in the administration of the Bankruptcy Act have cropped up before and Congress has acted to prevent their reoccurrence. For example, as pointed out by the Referee where, before the Chandler Amendment to the Bankruptcy Act of 1938, a bankrupt in inheriting a large sum of money just after he became a bankrupt was entitled to the inheritance free of any claim of his pre-bankruptcy creditors provided he was entitled to a discharge. See 4 Colliers on Bankruptcy (14th Ed.) Para. 70.27.

█ In his order of June 23, 1959, the Referee promises to award the trustees and their counsel a reasonable fee out of the fund of $6,095 for their troubles in creating the fund. We are unable

to see how they were instrumental in doing so. All the trustees did was to channel payment of the fund to the estate. From the Referee's and our conclusions, this was a mistake. The trustees should not be compensated on that ground. Should counsel for the trustees succeed in eventually having this court's ruling reversed on appeal, then his efforts may be comparable to that of the trustee in City of New York v. Rassner, 2 Cir., 1942, 127 F.2d 703, 705, and he might be given some monetary consideration if his present fee is inadequate.

Accordingly, with the exception of the clause, "less a reasonable fee to the trustees and their counsel to be determined by the Referee when and if this order becomes final," the order of the Referee will be affirmed.