In the Matter of Robert Junior GOOD-
SON, Bankrupt.

No. 9159.

United States District Court
S. D. California, S. D.

Aug. 30, 1962.

As Amended Sept. 27, 1962.

838

Richard A. Peterson, San Diego, Cal., for trustee.

Philip Crittenden, San Diego, Cal., for bankrupt.

WEINBERGER, District Judge.

The petition in bankruptcy was filed by the bankrupt Goodson on November 30, 1960. During the whole of the year 1960 Goodson received wages, and his employer made income tax withholdings therefrom for income tax purposes. For several years previous, Goodson had been supporting his aunt and his mother-in-law, in addition to himself, his wife and his child. The mother-in-law and aunt did not work, except for occasional baby-sitting jobs, and there was no other person residing in the United States who contributed to their support. Occasional contributions came from a relative in Mexico, when he worked, but this source was uncertain. In the years 1958 and 1959 the bankrupt supported the mother-in-law and aunt, but did not claim them as exemptions for withholding purposes until the end of the year, and in each of these years received a refund. He followed the same procedure in the year 1960. At and prior to the time he filed bankruptcy proceedings November 30, 1960 Goodson was and had been during the year, the sole support of the persons last mentioned, and there was a possibility that by claiming them as dependents at the end of the taxable year, he would receive a refund from the excess of the amounts withheld from his wages over the amount of income tax due.

At the first meeting of creditors on December 20, 1960, the Referee signed an order requiring Goodson to furnish the trustee in bankruptcy with a copy of his federal income tax return for the year 1960 and endorse any refund check received to the order of the trustee and turn the same over to said trustee. The bankrupt's tax return had not been filed at the time of the first meeting of creditors, and would not be filed until January 1, 1961, or after the close of the taxable year.

The bankrupt complied with the terms of the income tax order and on April 21, 1961, furnished to the trustee a copy of the federal income tax return for the income year 1960, and endorsed the refund check received in the amount of $282.39 to the trustee and turned the same over to said trustee.

On August 21, 1961 the bankrupt filed a petition that the Referee determine that the trustee was not entitled to any part of the income tax refund and that discharge be granted forthwith.

The Referee held a hearing on said petition and under date of October 25, 1961 made findings to the effect that the amount of the refund attributable to withholdings from the wages of the bankrupt prior to banruptcy was the sum of $233.55, and the amount of the refund attributable to withholdings from the wages of the bankrupt after bankruptcy was the sum of $48.44. (This computation has not been questioned by either party to this review.)

The Referee concluded that the refund arose from the unlawful collection or detention of the bankrupt's property, and that the sum of $233.55 vested in the trustee by operation of law, and that the sum of $48.84 should be returned to the bankrupt.

The Referee further concluded that since no petition for review of the December 20, 1960 order (directing the bankrupt to file with the trustee a copy of his income tax return and turn over to the trustee any refund check) until after partial compliance with said order, the same was res judicata, and that the petition for an order that the trustee was not entitled to said moneys should be denied.

The Referee then ordered the trustee to cash the refund check, pay to the bankrupt the sum of $48.84 and retain the sum of $233.55.

The bankrupt has petitioned to review the order of October 25, 1961, claiming that the Referee erred in determining that the trustee was entitled to any portion of the refund.

If we understand correctly the trustee's position, it is asserted that the bankrupt is barred from questioning the trustee's title because he did not seek a review from the Referee's original order of December 20, 1960 within the 10 day period provided by law, and that he is likewise barred because when he complied with the Referee's order to turn the refund check over to the trustee he waived the right to contest the trustee's title to said moneys.

It is evident to us that when the Referee made the order of December 20, 1960 that the bankrupt should turn over to the trustee his income tax return check she did not, by such order, adjudicate that the trustee had title to it; the order does not mention such a finding or conclusion. It is the order here sought to be reviewed, the order of October 25, 1961, that gives to the trustee the right to part of the proceeds of the check; further, in a transcript of a hearing held February 7, 1962 in a similar case (In re William Van Meter, D.C., 208 F.Supp. 835) we note at page 32 of Vol. 1, the following:

"MRS. ROSSI: Well, then, as a matter of practice, although the order doesn't specify it, we have said that when you can ascertain from the return what portion of withholdings held prior to the filing of the petition bear to the total return, that the bankrupt would be entitled to the remainder and the trustee entitled to that portion. You can't make an order as to what that proportion amounts to, until after you see whether there is going to be a refund at all. In other words, until after you determine how much the Government is going to set off over and against the fund withheld."

It appears from the Referee's statement above quoted that it was her intention that the turning over of the check to the trustee would stand in the nature of a "deposit in Court" with title to be adjudicated later.

We do not feel, under the circumstances and the practice of the Referee, it was obligatory upon the bankrupt to seek a review until the Referee adjudicated the title to the money.

We now pass to a consideration of the respective rights of the trustee in bankruptcy and the bankrupt in the refund paid on the bankrupt's income tax. The trustee argues that he is entitled to the portion of the refund allocated to him by the Referee as the amount of withholdings attributable to wages earned by the bankrupt prior to November 30, 1960, the date of the filing of the petition in bankruptcy, and the bankrupt argues that the trustee has no right to any of the refund, that all of said money is property acquired after the filing of the petition in bankruptcy and belongs to the bankrupt free of the claims of any creditor.

Section 70, sub. a of the Bankruptcy Act (11 U.S.C.A. § 110, sub. a), in the portions which we deem pertinent to the case at bar, reads as follows:

"(a) The trustee of the estate of a bankrupt * * * shall in turn be vested by operation of law with the title of the bankrupt as of the date of the filing of the petition initiating a proceeding under this title, except insofar as it is to property

which is held to be exempt, to all of the following kinds of property wherever located * * * (5) property, including rights of action, which prior to the filing of the petition he could by any means have transferred * * * (6) rights of action arising upon contracts, or usury, or the unlawful taking or detention of or injury to his property; * * *."

The trustee in the instant case cites the opinion in the case of Chandler v. Nathans (3 Cir. 1925) 6 F.2d 725, as supporting the order of the Referee in Bankruptcy awarding to said trustee a portion of the bankrupt's income tax refund. In the opinion of the Court of Appeals the facts in such case showed that the bankrupt, Chandler, purposely set out on his return for the year 1919, an income substantially larger than he actually received. This resulted in assessment of taxes in excess of the amount actually due. Chandler made three payments on the taxes so assessed; then, in need of money he filed a claim for a refund of excess taxes previously paid and unlawfully collected. While his claim was pending, he went into bankruptcy, and his trustee prosecuted the application for a refund, and received the sum of $44,549.60 from the Government. Chandler then filed a petition with the Referee that he be allowed the money, the Referee denied the petition and the District Court affirmed, 3 Cir., 290 F. 988. The Court observed that the right to apply for a refund of taxes, and the refund, when granted, vested in the trustee under Subdivision 6 of Section 70, sub. a of the Bankruptcy Act which includes rights of action arising upon contracts or from the unlawful taking or detention of, or injury to, the bankrupt's property; that his property was the money he had paid for taxes, which had left him and had been received and detained by the Government; the money was no longer in his possession, yet he was the owner of a claim upon the United States for its return, and Congress had given him the right to recover the property which he had improvidently turned over to the Government and which the Government had unlawfully received and detained.

At page 728 of its opinion, the Court stated:

"* * * Manifestly this is a property right. Of course such a right cannot be assigned and thereafter the money collected from the government by the assignee, for that would be in violation of section 3477 of the Revised Statutes (Comp.St. § 6383). But here the right was not assigned to the trustee, and the trustee, if he can validly exercise the right, does it not as assignee but as one to whom the right has passed by operation of the bankruptcy law. If it come to him by operation of this law, it is, we shall assume, because of the words of the law, vesting in him 'rights of action arising * * * from the unlawful taking or detention of * * * his property.'

"There is no doubt that the government unlawfully took and unlawfully detained what, by its refund, it has admitted to be an unlawful tax —that is, there is no doubt that the government unlawfully took and detained the 'property' of the taxable; and there is no doubt that, but for bankruptcy, Chandler would have a right to receive the money refunded. His right to the money refunded was based on his right to his property, and this right was recognized by the act of 1918, when it gave him a method or action by which to regain his property. * * * The right to a refund of taxes unlawfully paid and collected was a new right. Before the statute created it, no such right existed. In conferring the right, the statute provided for its exercise by prescribing the proceeding and designating the forum, namely, the presentation of a petition to a certain department of the government which had the power—that is, which had jurisdiction—to pass upon the petition,

adjudicate the claim, and allow or withhold the refund. Therefore we think the words 'rights of action arising * * * from the unlawful taking or detention of * * * his property,' are broad enough to include the right to a refund asserted in an action or proceeding instituted and prosecuted before the Treasury Department, and that such a right of a bankrupt taxpayer vests in his trustee by operation of the bankruptcy law."

Counsel for the bankrupt argues that the opinion in the case of In re Sussman, (3 Cir. 1961) 289 F.2d 76 is determinative of the question here presented, and that under the holding in such case, the trustee herein acquired no right to any part of the refund on Goodson's taxes.

The Sussman case involved a tax refund on a loss carry-back. The bankrupt, Sussman, had been a partner in a business which suffered heavy losses early in 1956. In June of said year, Sussman and the partnership filed a voluntary petition in bankruptcy. The bankrupt had paid income taxes for 1954 and 1955. The business losses in 1956 resulted in a net operating loss for the year which gave rise to a carry-back adjustment. The trustee, in March of 1957, filed application for such adjustment, the claim was allowed, and the money was paid to him. Thereupon Sussman moved that the trustee surrender the fund; the Referee so directed, and the District Court, 188 F.Supp. 320, affirmed the Referee.

In its opinion, affirming the District Court, the Court of Appeals stated at page 78:

" * * * In June, 1956, Sussman may well have contemplated the likelihood that he would be able to assert a loss carry-back claim against the United States within a few months. But he could point to no existing fund and to no existing cause of action in which he had any legal or equitable interest.

"(1) Perhaps this June expectation that a right to a refund would arise six or seven months later can be described as a contingent claim against the United States. But no such formulation can enlarge or in any way alter the limiting terms and conditions upon which the sovereign has agreed to recognize such a claim. The United States has not agreed that such a contingent claim against it can be assigned or attached, as Section 70, sub. a(5) requires. Rather, the transferability of claims against the United States has been narrowly restricted by the Assignment of Claims Act, 31 U.S.C.A. § 203. Certainly, in June, 1956, Sussman's expectation of a future claim against the government was not assignable, even as between Sussman and any assignee. Cf. Matter of Ideal Mercantile Corp., 2 Cir., 1957, 244 F.2d 828, certiorari denied 1957, 355 U.S. 856, 78 S.Ct. 84, 2 L.Ed.2d 63; Wooton v. United States, 1949, 86 F.Supp. 143, 114 Ct.Cl. 608, certiorari denied 1950, 339 U.S. 903, 70 S.Ct. 517, 94 L.Ed. 1333.

"(2) We find the conclusion inescapable that in June, 1956 Sussman had no right of action against the United States and no vested or transferable property in his anticipated claim against the United States, within the meaning of Section 70, sub. a of the Bankruptcy Act. The unfortunate result of this is, as the referee pointed out, 'a windfall to the bankrupt at the expense of the creditors'. The fact that the very business losses which destroyed normal capacity to pay creditors have led to the tax rebate, makes it particularly unfair that this fund should be beyond the reach of the bankrupt's creditors. Thus, the normally satisfactory provisions of Section 70, sub. a have inequitable consequences in this very special situation. But we cannot correct this. Such a matter requires a legislative solution."

Each of the cases just discussed, as well as the case at bar involve claims of

the bankrupt and the bankruptcy trustee to money paid by the United States under the provisions of its Internal Revenue laws in connection with income taxes. The nature of the property involved in each case is different, however, and our decision here cannot be rested upon either the case of Chandler v. Nathans, supra (6 F.2d 725) or the case of In re Sussman, supra (289 F.2d 76).

When the bankrupt Goodson filed his voluntary petition in bankruptcy there was on deposit with the Government, credited or to be credited upon any amount owed or to be owed by him as income tax for the year 1960, a certain sum of money. This sum represented withholdings made each pay-day by his employer from his wages * * * contributions of Goodson toward the tax to be assessed. By not listing as exemptions for withholding purposes all of the persons he was supporting, Goodson was building a savings for himself; there was an obligation on the part of the Government to pay him whatever amount he had to his credit at the end of the taxable year, less the amount owed as income tax. Goodson had an *interest* in a particular fund, the portions of his wages he had thus contributed; and since the withholdings were in excess of the actual amount required by law to be withheld, there was a *possibility* that he would regain some of the amounts thus deposited in the form of a tax refund at the end of the taxable year. This interest constituted personal property of Goodson.

Was such property of Goodson's the sort "which prior to the filing of the petition he could by any means have transferred?" Or, was such property of Goodson's the sort which could be described as a right of action "arising upon contracts, or usury, or the unlawful taking or detention of or injury to his property"?

Let us consider first if Goodson's property was included within the purview of sub. a(5) of Section 70 of the Bankruptcy Act. Was it, prior to the filing of the bankruptcy petition, transferable?

■ One of the prime purposes of the Bankruptcy Act is to make all of the bankrupt's non-exempt property available to his creditors. (In re Thompson's Estate, (3 Cir. 1951) 192 F.2d 451).

■ Whether an asset is of large or little value does not affect trustee's right to receive it. His title is not less valid because difficulties may be encountered in reducing the asset to money. The Court of Appeals of the Second Circuit used very clear language to emphasize these principles in an early case. In the Matter of Wright, (2 Cir. 1907) 157 F. 544:

"Now, it is of little importance whether the bankrupt and the insurance company, jointly or separately, might interfere with the trustee in realizing upon these interests. If they are property which can by any means be transferred, the creditors of the bankrupt are entitled to the benefit of them, however little they may bring. Marketability and assignability are quite distinct."

(P. 546) " * * * Contingencies might render the interest to be transferred to the trustee of little value; but they would not render such interest unassignable."

■ It is our view that in effectuating the purposes of the Bankruptcy Act the interpretation of Section 70, sub. a(5) should be a broad one, tending toward increased transferability of the bankrupt's property and greater availability of his assets. That the law has developed generally in this direction has been noticed in Collier on Bankruptcy (1942 Ed. recompiled as to Section 70, 1959) Vol. 4, p. 1293, n. 6, citing Simes, American Law of Property, 1952, Section 4.80; 1 Restatement Property, (1938) Section 158, comment e; 2 Powell on Real Property, (1950), 520.

The cause for broad interpretation is strengthened by the use, in Section 70, sub. a(5) of the words italicized: "*all* of the following kinds of property * * which * * * he could *by any means* have transferred." And, as observed by Circuit Judge Noyes, in In re Wright,

supra (157 F. 544) "Courts should not be swift to find reasons why creditors should not receive the benefit of all a bankrupt's assets."

Decisions under the Bankruptcy Act countenance a strong reliance upon state laws as the same regulate property rights and contracts, and the question of transferability is usually governed by state law, unless the federal laws indicate a contrary intention. (Board of Trade of City of Chicago v. Johnson, 264 U.S. 1, 44 S.Ct. 232, 68 L.Ed. 533; In re Landis, 7 Cir., 41 F.2d 700, cert. den. 282 U.S. 872, 51 S.Ct. 77, 75 L.Ed. 770; Matter of Furness, (C.C.A. 2) 75 F.2d 965; Horton v. Moore (C.C.A. 6) 110 F.2d 189, cert. den. 311 U.S. 692, 61 S.Ct. 75, 85 L.Ed. 448; Young v. Handwork, (7 Cir. 1949) 179 F.2d 70, 16 A.L.R.2d 825; Danning v. Lederer (C.A. 7, 1956) 232 F.2d 610; Hempy v. Bank of Tokyo of Calif. (9 Cir. 1960) 284 F.2d 93.)

In Horton v. Moore, supra (110 F.2d 189, 191,) the Court said:

"Under the plain language of the Act, all property vests in the trustee which prior to the filing of the petition the bankrupt could by any means have transferred. Therefore transferability is the determining factor. Under the language of the act a possibility coupled with an interest which may or may not become afterwards a vested estate passes to the trustee *if transferable under the local law*. Page v. Edmunds, 187 U.S. 596, 601, 23 S.Ct. 200, 47 L.Ed. 318, In re Wright, 2 Cir., 157 F. 544, 18 L.R.A.,N.S., 193; Fisher et al v. Cushman, 1 Cir., 103 F. 860, 51 L.R.A. 292; Pollack v. Meyer Bros. Drug Co., 8 Cir., 233 F. 861. 'Vested rights ad rem and in re, possibilities coupled with an interest, and claims growing out of, and adhering to property may pass by assignment.' Comegys v. Vasse, 1 Pet. 193, 26 U.S. 193, 213, 7 L.Ed. 108." (Emphasis supplied).

In Danning v. Lederer (7 Cir. 1956) 232 F.2d 610, 613, the Court discussed property held in the state of Illinois and said:

"* * * Section 70, sub. a of the Bankruptcy Act makes the trustee's title to the beneficial interest in the trusts dependent upon the bankrupt's power to alienate that interest, but the Act does not define the power to alienate. The definition of such power is left to the courts of the several states. By making the trustee's title dependent upon the alienability of the property the Act has made it dependent upon state law where that law has determined the question of alienability. * *"

The transferability of a particular interest such as is involved in this case has not been determined by California courts, but they have stated that the modern tendency is to favor assignments, and: "The statutes in this state clearly manifest a policy in favor of the free transferability of all types of property." Farmland Irrigation Co. v. Dopplmaier, (1957) 48 Cal.2d 208, 222, 308 P.2d 732, 740, 66 A.L.R.2d 590.

Section 1044, California Civil Code provides that property of any kind may be transferred except (Section 1045) a mere possibility not coupled with an interest, yet with reference to the exception, it was said in Dougherty v. California Kettleman Oil Royalties, 9 Cal.2d 58, 89, 69 P.2d 155, 171:

"The legal principle thus codified is not peculiar to California, but is generally recognized. However, it is well settled in this state, and elsewhere, that the restraint thus provided is applicable only to legal rights and does not apply in a case where the principles of equity are properly invoked. Equity, before and after the adoption of the Codes, has always recognized assignments of contingent interests and expectations."

The case from which we have just quoted involved an assignment of a percentage of oil to be produced on lands of the Government in consideration for the

securing of a permit to drill on such lands. In disposing of the objection that a regulation of the Government made such an assignment void, the Court observed that such regulations were designed to protect the Government and could not be taken advantage of by the parties to the assignment.

In Isaacs v. DeHon (C.C.A. 9) 11 F.2d 943, 944, before the Act under which was issued the permit to drill had been passed, defendants agreed to procure a permit and give plaintiffs a percentage of any oil or gas claims located under it, in return for "grubstake". The defendants located a claim and secured a permit, and the plaintiff sued for an interest in the latter. Of a Government regulation prohibiting the assignment of a permit prior to issuance, the Court of Appeals of the 9th Circuit ruled:

"Appellant is in no position to take advantage of this regulation. * * * But *appellant is nevertheless held in a court of equity to the obligations he assumed in his grubstake contract.*" (Emphasis supplied).

In H. S. Mann Corp. v. Moody, (1956) 144 Cal.App.2d 310, 301 P.2d 28, 34, the California law was stated as follows:

"Monies to be earned under an existing contract have long been held assignable at law; in the absence of an existing contract the question of assignability of potential earnings or other receivables is generally considered one for equity, which supplements and corrects the inadequacies of common law. Indeed this process has proceeded in this state to the point where the difference between law and equity vanishes for practical purposes so far as concerns the subject in hand. See First Nat. Bank [of Stockton] v. Pomona Tile Mfg. Co., supra, 82 Cal.App.2d 592, 606, 186 P.2d 693. 'The California cases relating to contingent results of existing contracts do not refer to such distinction, and they state the rule as a general one that equity will uphold assign-ments, not valid at law, of any future interest, as a rule applying alike to those which are vested, but relate to property to come into existence in the future, and those which rest only in possibility, provided they are fairly made and not against public policy.' Bridge v. Kedon, 163 Cal. 493, 497–498, 126 P. 149, 151, 43 L.R.A.,N.S., 404."

In Hudson v. Wylie (9 Cir. 1957) 242 F.2d 435, the Court of Appeals of the 9th Circuit held that the bankrupt's right to share in the profits of a joint venture, which profits had not yet accrued on the filing of the petition, constituted a possibility coupled with an interest, was property and would pass to his trustee. Citing the California court case of Cox v. Hughes, 10 Cal.App. 553, 557, 102 P. 956, 957, with approval for its enunciation of California law, the Court quoted from p. 557 of said case:

" 'The chance that A. may be employed sometime in the future by B., and thereby earn wages, is, of course a mere possibility not coupled with an interest, and it does not possess the element of negotiability. But, if the employment already exists, the wages to be earned from such employment, although a mere possibility, is coupled with an interest in A., and therefore assignable under the Code and the authorities. The proposition is so obvious as to require no further exposition.' "

Other examples of California's broad view of the enforceability of assignments are found in cases such as Fricker v. Uddo & Taormina Co., 48 Cal.2d 696, 312 P.2d 1085, assignment of an interest in moneys to be paid for crops not yet planted, and in Henshaw v. Henshaw, 68 Cal.App.2d 627, 157 P.2d 390, assignment by son of interest in trust fund subject to be defeased if he did not survive his mother.

The opinion in the case of Roosen Co. v. Pacific Radio Pub. Co. 123 Cal.App. 525, 531, 11 P.2d 873, 875, offers another example of the California viewpoint, and contains interesting language. There

was a partial assignment of money which might become due under a contract expected to be made, and the Court observed: "The assignment \* \* \* had for its support not merely a suppositious expectancy but a potentiality sufficient to support its validity."

■ It has been suggested that since the fund claimed by the parties to this review came into being through a law of the United States, federal and not local law would govern. There has not been cited, nor have we found, any special provision in the federal income tax statutes which implies a prohibition against the enforceability of an assignment such as we are here contemplating. The bankrupt is presumably domiciled here, the wages were presumably earned and withheld here, it is a permissible assumption that had the bankrupt made an assignment prior to bankruptcy, the assignment would have been made here; and since he was in this District and Division when the refund was made to him, it is likewise a permissible assumption that the enforcement of any such assignment would have been sought here. There is no reason to consider the law of any other state and California law will govern our ruling as to transferability, unless the same contravenes the policies of the Bankruptcy Act or presents an irreconcilable conflict with other laws of the United States.

In the Sussman case, supra (289 F.2d 76), the Court indicated that while Sussman's "expectation that a right to a refund would arise six or seven months later" might be described as a "contingent claim", the Assignment of Claims Act (31 U.S.C.A. § 203) provided one of the reasons upon which the Court based its decision that the "claim" was not assignable by Sussman.

As we have heretofore stated, we do not agree that the interest of the bankrupt Goodson was of the same type as that of the bankrupt Sussman; in fact, the District Court in the Sussman case (In re Sussman U.S.D.C.E.D.Pa., 188 F. Supp. 320) in a note at p. 323, expressly distinguished a claim for a loss carry-back from a claim for credit or refund on taxes *"erroneously* or *improvidently* paid *in whole or in part* by the bankrupt before bankruptcy."  (Emphasis supplied).

Because of the stress which has been placed upon the said statute by the bankrupt in another review which is pending before us and was heard with this one, (In the Matter of William Van Meter), a discussion of the Act and its purposes seems to be in order.

The Assignment of Claims Act, (31 U.S.C.A. § 203) in its pertinent provisions, reads as follows:

"All transfers and assignments made of any claim upon the United States, or of any part or share thereof, or interest therein, whether absolute or conditional, and whatever may be the consideration therefor \* \* \* shall be absolutely null and void, unless they are freely made and executed in the presence of at least two attesting witnesses, after the allowance of such a claim, the ascertainment of the amount due and the issuing of a warrant for the payment thereof. \* \* \*"

■ The purpose of the Assignment of Claims Act was to protect the Government from being harassed by multiplying the number of persons with whom it had to deal, to prevent persons of influence from buying up claims against the United States which might then be improperly urged upon the officers of the Government, to prevent possible multiple payment of claims, to make unnecessary the investigation of alleged assignments, to enable the government to deal only with the original claimant, and to save to the United States defenses which it has to claims by an assignor by way of set-off and counterclaim which might not be applicable to the assignee. Goodman v. Niblack (1880) 102 U.S. 556, 26 L.Ed. 229; United States v. Aetna Casualty and Sur. Co. (1949) 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171; United States v. Shannon (1952) 342 U.S. 288, 72 S.Ct. 281, 96 L.Ed. 321.

One of the interesting early cases having to do with said Statute is that of Milliken v. Barrow (1895) 5 Cir., 65 F. 888, affirmed 5 Cir., 74 F. 612, cert. den. 167 U.S. 746, 17 S.Ct. 991, 42 L.Ed. 1210. Pursuant to an Act of Congress, the Government agreed to pay a bounty on sugar. Barrow was a licensed sugar producer and planter under said Act, and owned a sugar plantation. In order to secure advances of money to cultivate his plantation, he had for some time borrowed from Milliken. In March, 1892, he issued a mortgage and pledge of his crop to Milliken in return for certain advances, said mortgage or pledge covering all crops to be made upon the plantation during the year 1892, and also mortgaging the plantation. In addition, he assigned to Milliken all bounties which might be allowed by the Government upon the sugar made on the plantation during the year, and agreed to endorse and deliver all evidences of claim to said bounty, and all checks given for said bounty.

He filed certain claims for bounty. Some were allowed and received before January 26, 1893, some afterward. On January 26, 1893, Barrow made a surrender of his property to his creditors which was accepted by the Court, and on January 31, 1893 one Alexander Barrow, plaintiff, was appointed "syndic" (trustee) to distribute his assets. The bounty drafts had been forwarded by Barrow (planter) to Milliken. Milliken held them, they having been sent to him after the insolvency proceedings. Barrow, the trustee, filed suit against Milliken, and Milliken claimed the assignment made March, 1892 in defense. The District Court rendered a judgment in favor of Milliken, declaring him to be the equitable owner, and the trustee appealed. It was argued that the Assignment of Claims Statute invalidated the assignment. The Court of Appeals (Fifth Circuit) held that there was nothing in the Assignment of Claims Act or the Sugar Bounty Act which would forbid pledging the crop to procure or aid in procuring advances for money necessary to plant, cultivate, harvest and market the crop, and that the contract between the assignor and the assignee was not contrary to the policy of the Assignment of Claims Act.

In the District Court opinion (65 F. 888, 894) it was stated:

"I reiterate that the act of 1853 was not intended to protect claimants. There is nothing contained in it which is intended to assist a claimant in resisting the enforcement of his contract. When, as in Spofford v. Kirk, the court refused to compel the claimant to carry out his agreement, it was only because this had to be done in order to give the government the protection which was the sole object of the enactment of the statute. Natural justice plainly requires that such an agreement as the one under consideration should be enforced unless there be some special prohibition."

The District Court also cited the law of Louisiana, and ruled: (p. 895)

"A hope or expectation of gain or profit in some enterprise may form the object of a contract of sale. (citing cases). That equity, in the absence of a special prohibition will enforce such an agreement as the one under consideration is perfectly clear."

Perhaps the case most frequently cited with reference to assignment of so-called contingent claims against the Government is Martin v. National Surety Co. (1937) 300 U.S. 588, 57 S.Ct. 531, 81 L.Ed. 822. There the Court held that since the sole purpose of the Assignment of Claims Act is to protect the Government and not to regulate the relationships between the parties, such assignments can be enforced between the parties.

Our Court of Appeals of the Ninth Circuit has likewise held such assignments valid against the assignor, in California Bank v. United States Fidelity & Guar. Co. (1942) 129 F.2d 751, 753, and Bank of California etc. v. Commissioner

of Internal Revenue (1943) 133 F.2d 428, 433.

In People of State of New York v. Hanley Milling Co. (1940, D.C.N.D. Ohio) 41 F.Supp. 844, affirmed per curiam, 6 Cir., 123 F.2d 819, it was held that an assignment of a claim for refund for processing taxes not yet allowed was not valid as against the Government because of the Assignment of Claims Statute, but the same operated as an equitable assignment which could be enforced by the assignee against the assignor.

We rule that the bankrupt's interest in the fund created by withholdings from his wages was property that he could have assigned prior to filing his petition in bankruptcy; that under both federal and state law, such assignment would have been valid and enforceable between the parties to the assignment, after receipt of the refund by the bankrupt. The Referee's award to the trustee of the portion attributable to the bankrupt's withholdings prior to bankruptcy was correct.

We are unable to agree that the bankrupt's interest in the withholdings from his wages, at the time his petition was filed, constituted any right of action, contingent or otherwise, *for property unlawfully taken or detained.* It is our understanding that the excess withholding was caused by the bankrupt so that he might receive a refund. The Government had the right to keep the withholdings until the entire tax could be ascertained, and it is our view that until the end of the taxable year it could not be said that any money of the bankrupt was unlawfully detained by the Government. It is possible that Goodson's interest might be termed a contingent right of action arising upon an implied contract, "money had and received"; but having found Goodson's interest to be included within sub. a(5) of Section 70 of the Act, there is no necessity for us to rule whether it also comes within any other subsection. Subsection (5) is the most comprehensive of all the Section 70 clauses in dealing with the bankrupt's property and broad enough to include nearly all, if not all, of the classes set out in the other subsections. (Matter of Furness, supra (75 F.2d 965).

For the reasons set forth in this opinion, the order here reviewed should be affirmed, and the petition to review denied.