[Civ. No. 21114. First Dist., Div. Three. Oct. 15, 1964.]

Estate of WALTER G. BRAY, Deceased. RICHARD P. BRAY, as Coexecutor, etc., Petitioner and Respondent, v. ESTELLE BOARDMAN ENSIGN JENSEN, as Executrix, etc., et al., Objectors and Appellants.

138

Henry C. Clausen, Henry C. Clausen, Jr., Sheldon C. St. Clair and Clausen & St. Clair for Objectors and Appellants.

Edward R. Solinsky, Doyle & Clecak and William P. Clecak for Petitioner and Respondent.

SALSMAN, J.—This is an appeal by Belle Bray,[1] as co-executrix of the will of her late husband, Walter G. Bray, from an order of the probate court denying her objections to the final report and account of her coexecutor, and ordering distribution of the estate as prayed for in the report.

Appellant and decedent Walter G. Bray were married in 1919, and their marriage continued until decedent's death in 1960. At the time of marriage neither party had any substantial amount of property. It is undisputed that all property involved in the present controversy is community property.

In 1929 decedent started a food brokerage business. For a short time he had a partner, but this relationship was termi-

---

[1]Subsequent to the taking of this appeal, Belle Bray died. Her executrices, Estelle Boardman Ensign Jensen and Leona Eugenia Ensign, were substituted in her place. For convenience, however, Belle Bray is referred to throughout the opinion as appellant.

nated and the business continued and was solely owned by decedent until the time of his death.

In 1938 the decedent requested his son by a former marriage, who is the respondent here, to come and work in the business. Respondent accepted the offer of employment, and from 1938 until decedent's death continued his employment in the business as a salaried employee.

In 1944, without the knowledge or consent of his wife, decedent opened a joint tenancy savings account with respondent, and each year thereafter deposited in the account funds withdrawn from his business bank account. No withdrawals were ever made from the joint account. At date of death the balance in the account, including interest additions, amounted to $74,385.88. Although respondent knew of the existence of this bank account, because he signed a form card for the bank when the account was opened, he did not know when deposits were made in the account, or in what amount, nor did he at any time before his father's death know the balance in the account. The bank book was at all times kept by the decedent.

The decedent also purchased U. S. Savings Bonds with community funds. These too were registered in the joint names of decedent and respondent, without the knowledge or consent of appellant. The value of these bonds at date of death was $10,701.94. The respondent did not know when the bonds were purchased, but he did know of their existence, because his father once asked him to make a list of the bonds, and respondent had them in his possession briefly for this purpose. After the list was prepared, respondent returned the bonds to his father, who retained possession of them until his death.

In proceedings for distribution of the decedent's estate, respondent claimed the bank account and bonds as surviving joint tenant. Appellant claimed the joint tenancies had been created by the use of community funds, without her consent and without valuable consideration, and therefore respondent should restore to the estate one-half the value of such joint tenancies. (Civ. Code, § 172; *Estate of McNutt,* 36 Cal.App. 2d 542, 553 [98 P.2d 253].)

The probate court found that respondent had rendered valuable consideration to the decedent in return for the creation of the joint tenancies in the bank account and bonds and that no part of such joint tenancy property belonged to the estate of the decedent. The valuable consideration relied upon by the court consisted of services rendered by respondent

to the decedent in the conduct of his business during decedent's lifetime. We have concluded that this finding is not supported by substantial evidence and that the order from which this appeal is taken must be reversed.

Respondent presented various witnesses in support of his contention that he rendered valuable consideration in return for the creation of the joint tenancies. He offered his own testimony thus: "Q. . . . the fact is that you paid nothing to your father for any of those deposits that went into this joint tenancy account? A. That is debateable [sic]. Q. Did you pay any money to him at all for that? A. I did not hand my father money out of my pocket for him to make a deposit, but the services that I rendered, and the consideration for that, to bring money into that business for my services, my father set that aside for me for my reward for the services rendered over the period of time when my salary was not exhorbitant [sic] and the fact that I worked Saturdays and Sundays and did not take vacations was considered. . . ."

Appellant testified that her husband had once told her that respondent " was a fine son and a fine boy and was doing a good job."

Grace Lillon, a niece of the decedent, testified that decedent had told her "God never blessed a man with a finer son than Dick. I could not run the business without him."

The testimony of Calvin Rossi, an employee of the bank where the joint account was maintained, was to the effect that the decedent had told him that his son had earned the money; that he did not want his son to know about the money but he "wanted him to have it at the end." Mr. Solinsky, decedent's attorney, testified that the decedent had told him "Dick was always on the job, was there, and was doing excellent work, and that he was taking care of Dick in view of all of his services."

Appellant objected to most of this testimony on the ground that it was hearsay and self-serving. (*Wicktor* v. *County of Los Angeles,* 141 Cal.App.2d 592, 597 [297 P.2d 115] ; 19 Cal. Jur.2d 195.) The trial court overruled these objections. Respondent asserts the testimony was properly admitted because it tended to show decedent's state of mind and his intentions regarding compensation for his son at the time the joint tenancies were created and as they were increased from time to time by the addition of deposits and the purchase of bonds. We think the evidence was properly admitted (*Hansen* v. *Bear Film Co., Inc.,* 28 Cal.2d 154, 173 [168 P.2d 946] ; see also McCormick, Evidence, pp. 567-578; Witkin, Cal. Evi-

dence, pp. 302-303; 19 Cal.Jur.2d 156), but that it falls far short of substantial evidence to show that a valuable consideration was received sufficient to support the transfer of community funds.

At the time the decedent opened the joint bank account with respondent there was no promise on his part to deposit any money in it in exchange for any promise, act or service on the part of respondent. There was evidence that once or twice the decedent had said to respondent that there was too much cash in the bank account—presumably the business checking account—and that some should be transferred to savings. But there was no evidence that such excess was deposited in the joint account because of any act or promise on the part of respondent. During the entire 15-year period, respondent never knew of any amounts deposited by decedent or when the deposits were made.

In 1944, when the account was opened, respondent's salary was $225 per month and he received no bonus. His compensation was at the same rate for the year 1945. Thereafter, respondent's basic salary increased from $250 in 1946 to $375 in 1959. In all years following 1945 save one respondent received a substantial annual bonus varying from $1,800 in 1946 to $5,000 for each of the four years prior to his father's death. There is evidence that in later years respondent had greater responsibilities than he had at first, but there is no evidence to show that these duties were assumed because of any promise by his father to deposit any money in the joint bank account.

Thus, we find no substantial evidence in the record to show that respondent rendered any valuable consideration to the decedent or gave any consideration at all for the creation of the joint tenancies in either the bank account or the bonds.

■ Consideration may be either (1) a benefit conferred or agreed to be conferred upon the promisor or some other person; or (2) a detriment suffered or agreed to be suffered by the promisee or some other person. (Civ. Code, § 1605.) [3] It must be an act or a return promise, bargained for and given in exchange for a promise. (*Simmons* v. *California Institute of Technology*, 34 Cal.2d 264, 272 [209 P.2d 581], and cases cited; Rest., Contracts, § 75, com. b.) ■ Here there is no evidence of any promise on the part of the decedent to make deposits in the joint bank account, or to buy bonds registered jointly in the names of decedent and respondent, in return for any promise on the part of respondent,

or any act on respondent's part. After the joint account was opened in 1944, respondent continued to render services to decedent's business as a salaried employee, with no knowledge of what money, if any, was actually being deposited in the joint account, or how many bonds were being purchased, if any. Respondent was duty-bound to render faithful service to the decedent in return for his salary and a bonus. Under the definition of consideration in Civil Code section 1605, doing what one is already legally bound to do cannot be consideration. (*Pacific Finance Corp.* v. *First Nat. Bank,* 4 Cal. 2d 47, 49 [47 P.2d 460] ; 1 Witkin, Summary Cal. Law, Contracts, p. 84, and cases cited.)

■ It is undoubtedly true that, as one witness testified, decedent wished to keep the joint account secret from respondent as well as his wife and that he intended respondent should have it ''at the end,'' that is, upon decedent's death. It is undisputed also that all deposits to the account were made from community funds. This evidence discloses only a gift, unsupported by a valuable consideration, and hence voidable in part by appellant, pursuant to Civil Code section 172.

■ There was some evidence received, over objection of appellant, that decedent had established joint tenancies with appellant during his lifetime, and that upon decedent's death appellant had received at least one-half of all property in which decedent had an interest at the time of his death. This evidence was immaterial to a resolution of the issue of whether a valuable consideration had been given for the creation of the joint tenancy bank account and the joint tenancies in the bonds. ■ A wife has a vested interest in all of the community property and her interest extends to every part and parcel of the community property estate. The husband during the lifetime of the parties may not give away any portion of it. In *Dargie* v. *Patterson,* 176 Cal. 714, 721 [169 P. 360], the court said: ''. . . upon the death of a husband who has attempted to convey community property contrary to the provisions of section 172, his nonconsenting wife may recover an undivided one-half of such property in an action brought against the grantee, and this without regard to the amount or condition of the estate remaining in his hands at the time of his death.''

Respondent contends, however, that the U.S. Savings Bonds belong to him absolutely and that appellant may not assert any interest in them. This contention is based upon the

United States Supreme Court's decision in *Free* v. *Bland,* 369 U.S. 663 [82 S.Ct. 1089, 8 L.Ed.2d 180], and upon the provisions of section 704 of our Civil Code.[2] In the *Bland* case the United States Supreme Court did hold that a state law which prohibited a married couple from taking advantage of the survivorship provisions of United States Savings Bonds merely because the purchase price is paid out of community property must fall, under the supremacy clause of the federal Constitution. Nevertheless the court expressly recognized that the survivorship provisions in federal bonds should not be allowed to become a "sanctuary for a wrongdoer's gains," and that relief should be available when "fraud or a breach of trust tantamount thereto on the part of a husband while acting in his capacity as manager of the general community property" is made to appear.

In a later case (*Yiatchos* v. *Yiatchos,* 376 U.S. 306 [84 S.Ct. 742, 11 L.Ed.2d 724]) it appeared that a husband, using community funds, but without consent of his wife, purchased U. S. Savings Bonds and registered them in his own name, payable on death to his brother. The court recognized that where a wife's interest in the community property extends to each item of the community estate an impermissible conversion of the widow's assets would result if all of the bonds were allowed to pass to the designated beneficiary. We think the decision in *Yiatchos* v. *Yiatchos, supra,* is controlling here. In the case we now consider, the decedent had the right to management and control of the community personal property. (Civ. Code, § 172.) By virtue of his management of the community personal property he occupied the position

[2] "§ 704. All United States savings bonds or other bonds or obligations of the United States, however designated, now or hereafter issued, which are registered in the names of two persons as coowners in the alternative, shall, upon the death of either of the registered co-owners, become the sole and absolute property of the surviving co-owner, unless the Federal laws under which such bonds or other obligations were issued or the regulations governing the issuance thereof, made pursuant to such laws, provide otherwise.

"All United States savings bonds or other bonds or obligations of the United States, however designated, now or hereafter issued, which are registered in the name of one person payable on death to a named survivor, shall, upon the death of the registered owner, become the sole and absolute property of the surviving beneficiary named therein, unless the Federal laws under which such bonds or other obligations were issued or the regulations governing the issuance thereof, made pursuant to such laws, provide otherwise.

"This section shall not be construed to mean that prior to the enactment hereof the law of this State was otherwise than as herein provided."

of a trustee for his wife in respect to her one-half interest in the community assets. (*Vai* v. *Bank of America*, 56 Cal.2d 329, 337 [15 Cal.Rptr. 71, 364 P.2d 247].) Disposition by him of any part of the community property without valuable consideration violates Civil Code section 172, and amounts to a breach of trust (*Dargie* v. *Patterson, supra*). Here decedent's transfer without valuable consideration of community funds into savings bonds registered in his name and that of respondent cannot operate to defeat appellant's community property interest, and respondent must account to appellant for the funds so transferred. (See *Chase* v. *Leiter*, 96 Cal.App.2d 439, 452, 453 [215 P.2d 756], and cases cited.)

Appellant also correctly contends that respondent should account for the profits of the Walter G. Bray Company, an asset of the estate, operated during administration. In the operation of a business, executors are bound to account to the estate for the income or profit. (See *In re Rose*, 80 Cal. 166 [22 P. 86]; *Estate of De Rome*, 175 Cal. 399 [165 P. 919]; see also Cal. Est. Admin. (Cont.Ed. Bar), § 38.17, p. 966.)

 It is true respondent testified he had an agreement with appellant that "the accounting and running of the business should be kept entirely separate from the other income in the estate," but this does not show that an accounting was waived, and under established rules of probate practice, an accounting of the income of the business was required.

 There is no merit in appellant's claim that the probate court erred in allowing both attorney's and accountant's extraordinary fees for the same tax services. Each rendered extraordinary services and each was entitled to a fee. (Prob. Code, §§ 902, 910.) The amount was discretionary with the court. (*Estate of Isenberg*, 63 Cal.App.2d 214 [146 P.2d 424].) No abuse of discretion appears in the amount allowed, and no error.

 Respondent further claims that Belle Bray ratified and confirmed the creation of the joint tenancies in the bank account and the bonds. This assertion derives from the fact that she signed the inventory and appraisement and the federal estate tax return and that both the inventory and the tax return showed the joint tenancy character of the bank account and the bonds. It does not appear however that the widow understood the significance or the legal meaning of the term "joint tenancy," or that the term was explained to her by counsel. Moreover, there is substantial evidence that she was ill at the time the documents were presented to her for signature and that she did not read them. Although

the issue of ratification was raised in the trial court, the respondent requested no finding on it, and the probate court made none. From our examination of the record we conclude that the claim is without merit.

The order is reversed, with directions to the probate court to require respondent to account to the estate for one-half of the joint tenancy bank account and for one-half of the U. S. Savings Bonds, and upon the basis of such accounting, to fix and determine the fees of the executors and their attorneys as provided by law.

The decree of distribution is also reversed insofar as it approves the apportionment of federal estate tax against the respective interests of Richard P. Bray and Belle Bray, and insofar as it determines amounts of California inheritance tax chargeable against the interests of said parties, and the court is directed to determine the properly chargeable amounts in view of the revised distribution directed herein. The probate court is further directed to require respondent to account for any profits of the Walter G. Bray Company earned during the course of administration of the estate.

In all other respects, the decree of distribution is affirmed.

Draper, P. J., and Devine, J., concurred.

A petition for a rehearing was denied November 5, 1964, and the opinion and judgment were modified to read as above. Respondent's petition for a hearing by the Supreme Court was denied December 9, 1964.