[Civ. No. 12473. Fourth Dist., Div. Two. Dec. 27, 1973.]

BANK OF CALIFORNIA, as Administrator With the Will Annexed, etc., Plaintiff, Cross-defendant and Respondent, v.
JOSEPH L. CONNOLLY et al., Defendants, Cross-complainants and Appellants;
MILDRED LOUISE LATIMER, Defendant, Cross-defendant and Respondent;
JUDITH ANN SCHLOESSMANN, Defendant, Cross-complainant and Respondent.

354

**COUNSEL**

Daniel Schnabel for Defendants, Cross-complainants and Appellants.

Westover, Currey & Matsen and Harry E. Westover for Plaintiff, Cross-defendant and Respondent and for Defendant, Cross-complainant and Respondent.

Covington & Crowe and Robert E. Dougherty for Defendant, Cross-defendant and Respondent.

**OPINION**

**TAMURA, J.**—This is an appeal from a judgment in a declaratory relief action brought by The Bank of California (Bank) as successor administrator with will annexed of the estate of Charles R. Latimer (deceased), against Joseph L. Connolly, Forde C. Seward, Mildred Louise Latimer (decedent's wife), Mike Kelber and Judith Ann Schloessmann (decedent's daughter), to determine the rights and obligations of the parties under a written agreement between Latimer, Connolly and Seward to share profits from the sale of two parcels of land owned by Latimer and Kelber. Defendants Connolly, Seward and Schloessmann cross-complained against the Bank and each other setting forth their respective contentions concerning the meaning and legal effect of the agreement. Basically, Connolly and Seward contended it was a joint venture or partnership agreement, was a valid profit sharing agreement, or that it constituted a valid gift. It was further their contention that defendant Kelber should be held to be a trustee for them for their share of the profits. Schloessmann contended that the agreement was invalid for lack of consideration, that it was unenforceable insofar as Seward was concerned because of his breach, and that Connolly was foreclosed from maintaining an action on the agreement because of alleged irregularities in the presentation of his creditor's claim against the estate. Mildred Latimer contended that Latimer's interest in the properties described in the profit-sharing agreement was community property and that the agreement was invalid as to her community interest.

Connolly and Seward had filed creditors' claims against the estate based upon the agreement. The claims were denied and each brought an action against the Bank as administrator of the estate. Pursuant to stipulation those two actions were consolidated with the declaratory relief action for purpose of trial.

The court decided, in substance, that the profit sharing agreement was enforceable only as "an assignment of an equitable interest" in the profits, if any, from the sale of the lands and then only to the extent of the reasonable value of services rendered to Latimer by Connolly and Seward "in connection with 'The Agreement,' " such amount to be determined in future proceedings in the pending actions on the rejected creditors' claims. Separate but virtually identical findings, conclusions and judgments were entered in the three actions. Connolly and Seward filed a notice of appeal from the judgment in the declaratory relief action[1] but took no appeal from the judgments entered in the actions on the creditors' claims.

Deferring for the moment a detailed review of the evidence as it pertains to specific issues, the facts and circumstances giving rise to the controversy between the parties may be summarized as follows:

Latimer had been a real estate broker in the City of Ontario for many years. Apart from his business interest, he was active in city affairs, having served as Councilman and Mayor of Ontario. He married Mildred Latimer on September 23, 1963, and they remained husband and wife until his death on January 5, 1969.

Connolly joined Latimer's real estate office in 1957 or 1958. During his association with Latimer, gross commissions from real estate sales were shared equally. Since Latimer used his office to handle business interests unrelated to real estate brokerage as well as to conduct his civic and political activities, he paid all office overhead. Seward joined the office in 1963. Thereafter commissions were divided equally among the three. Latimer continued to pay office overhead. All firm advertisements were carried in the name of Latimer, Connolly and Seward and the office bore the sign "Latimer, Connolly & Seward Real Estate."

Mike Kelber was a long-time friend and business associate of Latimer. They both had interests in the Ontario Savings and Loan Association and had been associated in real estate ventures. In 1964 Kelber and Latimer acquired a 10-acre parcel in the City of Upland referred to as the 7th and Mountain property and a 67.744-acre parcel adjacent to the Ontario Airport referred to as the airport property. Record title to the properties is in Kelber's name. The 7th and Mountain property was purchased with the proceeds of a $239,000 loan from United California Bank evidenced by

---

[1]Seward died before trial but by stipulation the actions were continued in his name. Although Seward's interest is represented in this appeal by Raymond Wilhelm as administrator of the estate of Forde C. Seward, we shall for convenience, continue to use the party designation "Seward."

an unsecured note signed by Kelber and Latimer. Acquisition of the airport property was financed by two loans from the United California Bank, one for $420,000 secured by the airport property and the other for $360,000 secured by property in Alta Loma acquired by Latimer and Kelber in 1960.

Connolly and Seward did not contribute any money toward the purchase of the properties but there was evidence that they rendered some service in connection with the acquisitions. The airport property had at one time been listed with Latimer's office but the owner later took it off the market. In August 1964 Kelber learned that the property was again on the market so he alerted Latimer who in turn instructed Connolly to contact the owner. Connolly and Seward made several extended trips to see the owner and "bird dogged" him as to the price. With respect to the 7th and Mountain property, Connolly learned from friends in Minnesota that the first trust deed held by a Minneapolis lending institution was for sale. He called Kelber's and Latimer's attention to the availability of the trust deed and recommended its purchase. Kelber and Latimer bought the trust deed and obtained title to the property by foreclosure.

The escrow on the 7th and Mountain property closed in August 1964 and the one on the airport property on or about October 5, 1964. On October 6, 1964, Latimer, Connolly and Seward entered into the profit sharing agreement which is the subject of this litigation.[2]

According to Connolly, Latimer had discussed such an agreement for years, stating he was grateful for all that Connolly and Seward had done for him and wanted to help them; one of the reasons for the agreement was to induce Connolly and Seward to remain and run the real estate business;

---

[2]The agreement reads as follows:
"October 6th 1964.
"IT IS AGREED AND ACKNOWLEDGED by and between Charles R. Latimer, Joseph L. Connolly and Forde C. Seward, that the three persons named above shall share equally, share and share alike, in one-half of the profits which shall be realized from the following properties, namely;
"1. The 10-acre parcel located at the northwest corner of 7th Street and Mountain Avenue in the City of Upland, California.
"2. The 68 acres adjoining Ontario International Airport which now stands of record in the name of Security Title Insurance Company.
"The parties agree and acknowledge that Latimer has paid interest, taxes and other charges and costs of carrying said property, and he shall be first reimbursed for such charges and costs prior to division of any profits which shall be reqlized [sic] from the same.
"This agreement is binding on the assigns and successors in interest of all and each of the parties.

"/s/ CHARLES R. LATIMER /s/ JOSEPH L. CONNOLLY /s/ FORDE C. SEWARD
 Charles R. Latimer Joseph L. Connolly Forde C. Seward"

Latimer came into the office one morning with a handwritten draft of the proposed agreement which he read to Connolly and Seward and instructed them to take it to Bernard Kelber, Latimer's attorney; Bernard Kelber prepared the agreement in its final form and Connolly and Seward met Latimer at the Ontario Savings & Loan Association where the three signed. Bernard Kelber's testimony concerning the circumstances surrounding the preparation of the agreement was only slightly at variance with Connolly's version. Bernard Kelber testified that Connolly and Seward came to his office stating that Latimer sent them over to have the profit sharing agreement prepared; Kelber telephoned Latimer and prepared the agreement in accordance with Latimer's instructions. Kelber had previously heard Latimer discuss such an agreement and was familiar with its background.

Connolly testified that prior to the October 6 agreement, he, Latimer and Seward had discussed buying and selling land for capital gains tax advantage, Latimer to furnish the capital and Connolly and Seward their skills, and that they had looked at specific properties, including property at Morro Bay, as possible investments.

Connolly testified that he and Seward were expected to promote the sale of the properties described in the agreement; the two discussed with Latimer and Kelber possible sales and the strategy to be pursued; he (Connolly) made trips to eastern cities at his own expense to interest airlines in the airport property and Seward assisted in the preparation of sales brochures to present to prospective purchasers; he and Seward made attempts to interest chain stores and other potential buyers in the 7th and Mountain property.

During Connolly's association with Latimer, it was understood that Connolly would work on sales of properties owned by Latimer and his family without commission. Connolly testified that after Seward joined the firm, Latimer decided they should receive commissions for sale of Latimer properties but that, with one exception, they received no commissions for such sales and that after the October 6 agreement, he and Seward gave up substantial commissions on sales of Latimer properties.

After the October 6 agreement, Connolly and Seward borrowed large sums from the United California Bank; Connolly borrowed approximately $81,000 and Seward $63,000. In each instance the loan was arranged by and guaranteed by Latimer. The proceeds were used personally by Seward and by Connolly; none of the funds went to the real estate firm. Connolly testified that neither he nor Seward would have borrowed the monies had it not been for the anticipated profits from the profit sharing agreement and Latimer's repeated assurances that there was going to be plenty of

money for all concerned. Connolly also testified that because of the October 6 agreement, both he and Seward turned down attractive offers to go with other realty firms, but on cross-examination stated he felt he was under no legal obligation to remain with Latimer and that even had he left he would have still been entitled to the benefits of the agreement.

After the October 6 agreement, Latimer spent very little time on his real estate business. Mike Kelber testified that when Latimer delivered a copy of the October 6 agreement to him, he told Kelber the agreement assured him his real estate office would be maintained whether he was there or not. A few months before Latimer's death, Kelber visited him at the hospital. Latimer told Kelber that upon his release from the hospital he was going to close his real estate office and requested Kelber to inform Connolly and Seward to make arrangements to affiliate with some other realty firm. At that meeting the subject of the October 6 agreement was again discussed. Latimer told Kelber he "knew what he was doing and this was precisely what he wanted."

Seward left Latimer in October 1968 shortly after he was informed of Latimer's plan to close the office. Connolly remained until Latimer's death.

In July 1968 the City of Ontario commenced eminent domain proceedings to acquire 20.014 acres of the airport property. The matter went to trial and the jury fixed just compensation at $1,150,000.[3] In Kelber's opinion the value of the entire airport property (including the part condemned) was $3,590,000 and the 7th and Mountain property $500,000, making the total value of the two parcels $4,090,000.

The trial court impliedly rejected the various theories advanced by Connolly and Seward respecting the enforceability of the profit sharing agreement.[4] It concluded that profits to be derived from the sale of the lands were "a mere possibility, not coupled with an interest" and that the agreement was enforceable "only on the theory of assignment of an equitable interest and then only to the extent there was 'adequate consideration.'" It then found that "CONNOLLY and SEWARD rendered 'adequate consideration' to decedent LATIMER" in certain itemized particulars.

Based upon the findings and conclusions, the court decreed that Connolly and Seward were each "entitled to that percentage of one-third (⅓) of decedent LATIMER'S share of the net profits to be derived from the sale

---

[3]The judgment was affirmed in *City of Ontario* v. *Kelber,* 24 Cal.App.3d 959 [101 Cal.Rptr. 428].

[4]The court found against defendant Schloessmann in her attack on the enforceability of the profit sharing agreement.

of the real properties referred to in 'The Agreement,' which equals, in value, the value of the services rendered by him, as itemized . . . above."

The court further decreed that defendant Kelber was not responsible, as trustee or otherwise, to Connolly and Seward for their share of the profits under the profit sharing agreement; that Connolly's and Seward's rights could only be asserted as contingent claims against the estate of Latimer; that the "value of the services rendered" by Connolly and Seward "as itemized above" shall be determined in their pending actions on the rejected creditors' claims.

The court found that Latimer's interest in the properties described in the profit sharing agreement constituted community property of Latimer and his wife and prescribed a formula for charging their respective community interests for any amounts to which Connolly and Seward would be entitled under the profit sharing agreement.[5]

Connolly and Seward appeal from the judgment. They contend the court erred (1) in concluding the profit sharing agreement was only enforceable as an equitable assignment in that (a) the evidence established as a matter of law the existence of a partnership or joint venture relationship between Latimer, Connolly and Seward, (b) the agreement was enforceable on the theory of promissory estoppel, (c) the agreement was a valid profit sharing agreement enforceable according to its terms; (2) in concluding that their rights under the agreement can only be asserted as contingent claims against the estate of Latimer; (3) in concluding that Kelber was not a trustee for their benefit for their share of the profits; and (4) in failing to decree the agreement enforceable in full as to Mrs. Latimer's community interest in the properties.

The Bank (as administrator) and Judith Ann Schloessmann respond that

---

[5]The decree provided in part:

"v) In connection with the allocation of profits between decedent LATIMER's community property interest in said profits and the community property interest therein of his widow, MILDRED LOUISE LATIMER, the Probate Court having jurisdiction of the Estate of LATIMER should apportion the share of the profits allocated to CONNOLLY and SEWARD against the total profits in relation to the services rendered by CONNOLLY and SEWARD and whether those services benefited the community property estate of CHARLES R. LATIMER and MILDRED L. LATIMER (which share of the profits for those services should be charged equally to the entire profits) or whether those services benefited CHARLES R. LATIMER's separate property estate (which share of the profits for those services should be chargeable solely to CHARLES R. LATIMER's community property interest in said profits and not to the interest therein of his widow, MILDRED LOUISE LATIMER)."

the evidence fails to support any of the theories of enforceability advanced by Connolly and Seward and that the court correctly concluded the agreement was only enforceable as an equitable assignment and then only to the extent of any "adequate consideration" flowing from Connolly and Seward to Latimer. They further urge that the present appeal has become moot because the judgments entered in the actions on the rejected creditors' claims from which no appeal has been taken are now final.

Mildred Latimer contends that while the court properly found that Latimer's interest in the property was community, it should have decreed that the profit sharing agreement constituted an attempted transfer by the husband of an interest in community real property and as such was enforceable, if at all, only as to Latimer's community interest.

Defendant Mike Kelber filed responsive pleadings in the court below but has not filed a brief on this appeal.

## I

■ The threshold issue pertains to the effect of the failure to appeal from the judgments entered in the actions on the rejected creditors' claims. The Bank suggests that the finality of those judgments renders the present appeal moot since they resolved the same issues presented in the instant declaratory relief action. The contention is non-meritorious.

The actions on the creditors' claims were consolidated for trial with the declartory relief action on the representation that the issues were the same in all three cases. The same findings of fact, conclusions of law, and judgments were entered in each case. ■ Where two lawsuits are ordered consolidated for trial and actually tried together, there should be but one set of findings of fact, conclusions of law, and judgment, and if duplicate sets have been entered in each case, they will be considered for all purposes as but one. (*Bechtold* v. *Bishop & Co., Inc.,* 16 Cal.2d 285, 287 [105 P.2d 984]; *Israel* v. *Campbell,* 163 Cal.App.2d 806, 820 [330 P.2d 83]; *Wolfson* v. *Beatty,* 118 Cal.App.2d 392, 398 [257 P.2d 1017]; *Clinton* v. *Hogan,* 80 Cal.App.2d 815, 821 [183 P.2d 50].) ■ The appeal from the judgment in the declaratory relief action must, therefore, be treated as an appeal from the duplicate judgments entered in the actions on the creditors' claims. (Cf. *Wolfson* v. *Beatty, supra,* 118 Cal.App.2d 392, 398.)

## II

■ On the merits, we first consider the contention that the court erred in failing to find that the agreement created a partnership or joint venture relationship.[6]

■ Although a partnership ordinarily involves a continuing business, whereas a joint venture is usually formed for a specific transaction or a single series of transactions, the incidents of both relationships are the same in all essential respects. (3 Witkin, Summary of Cal. Law (7th ed. 1960) pp. 2271-2272.) ■ A joint venture exists where there is an "agreement between the parties under which they have a community of interest, that is, a joint interest, in a common business undertaking, an understanding as to the sharing of profits and losses, and a right of joint control." (*Holtz* v. *United Plumbing & Heating Co.,* 49 Cal.2d 501, 506-507 [319 P.2d 617]; *Connor* v. *Great Western Sav. & Loan Assn.,* 69 Cal.2d 850, 863 [73 Cal.Rptr. 369, 447 P.2d 609, 39 A.L.R.3d 224].) ■ An essential element of a partnership or joint venture is the right of joint participation in the management and control of the business. (*Spier* v. *Lang,* 4 Cal.2d 711, 716 [53 P.2d 138].) Absent such right, the mere fact that one party is to receive benefits in consideration of services rendered or for capital contribution does not, as a matter of law, make him a partner or joint venturer. (*Spier* v. *Lang, supra; Zorich* v. *Petroff,* 152 Cal.App.2d 806, 810 [313 P.2d 118]; *Howard* v. *Societa di Unione etc. Italiana,* 62 Cal.App.2d 842, 848 [145 P.2d 694].) ■ An agreement by a landowner to share with another profits to be derived from the sale of land does not, without more, create a partnership or joint venture relationship. (*Fritz* v. *Gilbert,* 8 Cal.2d 68, 70-71 [63 P.2d 291]; *Mulligan* v. *Wilson,* 94 Cal.App.2d 286, 291-292 [210 P.2d 526]. See *Coward* v. *Clanton,* 122 Cal. 451, 454 [55 P. 147].)

■ Whether a partnership or joint venture exists is primarily a factual question to be determined by the trier of fact from the evidence and inferences to be drawn therefrom. (*Nelson* v. *Abraham,* 29 Cal.2d 745, 750 [177 P.2d 931]; *Spier* v. *Lang, supra,* 4 Cal.2d 711, 716; *Epstein* v. *Stahl,* 176 Cal.App.2d 53, 57 [1 Cal.Rptr. 143].) ■ While there was evidence in the case at bench that Latimer, Connolly and Seward may have enjoyed a partnership or joint venture relationship with respect to the real estate brokerage business, there was sufficient evidence to support the trial court's implied finding that the relationship did not extend to investment in the

---

[6]Although the court made no affirmative findings on the partnership or joint venture issue, its finding that the agreement was only enforceable as an equitable assignment constituted an implied finding that such a relationship did not exist.

properties covered by the profit sharing agreement. During their years of association, Latimer, Connolly and Seward had never been involved in such a joint undertaking. Kelber, with whom Latimer acquired the properties, was not a partner in or otherwise associated with Latimer's real estate business; the capital and all other expenses for the acquisition of the properties were furnished by Kelber and Latimer and they alone were to share any losses. Finally, on the evidence adduced, the court was justified in finding that the essential element of *right* to joint control was absent. Although Connolly testified he and Seward discussed marketing strategy with Kelber and Latimer, the court could have reasonably inferred that the two were invited to participate in those discussions, not because they had a voice in management decisions concerning the properties, but because they were expected to provide their skills and services in promoting the sale of the properties.

There was substantial evidence to support the trial court's implied rejection of the partnership and joint venture theories.

### III

The contention that the agreement was enforceable as a matter of law on the theory of promissory estoppel must also fail.

Section 90 of the Restatement of Contracts states: "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." The doctrine as expressed in the Restatement is the law of this state. (*Drennan* v. *Star Paving Co.,* 51 Cal.2d 409 [333 P.2d 757].)

Connolly and Seward contend the detriment suffered in reliance on Latimer's promise consisted of borrowing large sums from the Bank and foregoing lucrative offers to join other realty firms. The borrowed funds, however, were for the personal use of Connolly and Seward. The record does not disclose what they did with the proceeds of the loans, but the fact, if it be a fact, that the funds were lost through imprudent investments or speculation cannot be attributed to Latimer's promise. While Connolly testified to attractive offers from other realty firms, the evidence was conflicting whether his financial position would have been enhanced by accepting the offers.

Generally, whether estoppel exists is a factual question and ordinarily the determination of the trier of fact is binding on appeal unless the contrary conclusion is the only reasonable one to be drawn from the facts.

(*Albers* v. *County of Los Angeles,* 62 Cal.2d 250, 266 [42 Cal.Rptr. 89, 398 P.2d 129]; *Landberg* v. *Landberg,* 24 Cal.App.3d 742, 759 [101 Cal. Rptr. 335]; *In re Mercantile Guaranty Co.,* 263 Cal.App.2d 346, 356 [69 Cal.Rptr. 361].) ▪ The burden is on the one asserting estoppel to prove its essential elements, "leaving nothing to surmise or questionable inference." (*Landberg* v. *Landberg, supra,* 24 Cal.App.3d 742, 759.) ▪ On the record, there was no estoppel as a matter of law.

## IV

▪ We proceed to the central issue on this appeal and that is whether the agreement was a valid profit sharing agreement enforceable according to its terms.

In his memorandum opinion, the trial judge held that the profit to be derived from the sale of the lands was a "mere possibility, not coupled with an interest" and non-transferable at law and that consequently the agreement was only enforceable as an equitable assignment and "then only to the extent that there was adequate consideration for said assignment." He noted that evidence of consideration for the agreement was "not of the strongest," but stated: ". . . There is no question, but that the decedent was satisfied with the pending business relationship wherein he was free to pursue his 'other' activities. Also it can be found that the decedent relied upon these individuals to actively promote his property as well as the property included in the agreement of October 6, 1964. To this extent then, the Court will find adequate consideration for the equitable assignment. . . ."

At common law a mere possibility, such as the expectancy of an heir, was not regarded as such an existing interest as to be capable of sale or assignment. (*Bridge* v. *Kedon,* 163 Cal. 493, 495 [126 P. 149]; *In re Garcelon,* 104 Cal. 570, 584 [38 P. 414]; 4 Pomeroy's Equity Jurisprudence (5th ed.) § 1285, p. 819.) An expectancy or possibility, however, was deemed transferable when coupled with an interest, whether with real or personal estate. (4 Pomeroy's Equity Jurisprudence, *supra,* § 1285, p. 819.) The common law rules have been codified in California. Civil Code section 700 provides: "A mere possibility, such as the expectancy of an heir apparent, is not to be deemed an interest of any kind." Civil Code section 1045 provides: "A mere possibility, not coupled with an interest, cannot be transferred."

Although a mere possibility not coupled with an interest was non-transferable at common law, assignments of things which have no present existence but rest in possibility were treated as contracts which equity will enforce upon the happening of the contingency if the agreement was fairly

made, supported by valuable consideration, and not against public policy. (*Bridge* v. *Kedon, supra,* 163 Cal. 493, 498; *In re Garcelon, supra,* 104 Cal. 570, 584; *Cheek* v. *Farmers etc. Nat. Bank,* 14 Cal.App.2d 176, 179 [57 P.2d 1325]; 4 Pomeroy's Equity Jurisprudence, *supra,* § 1287, pp. 821, 822; Note 22 Cal.L.Rev. 446, 447. See *In re Goodson,* 208 F.Supp. 837, 843-845.) Valuable consideration to support an assignment of an expectancy is the same as that required for the formation of a contract. (See *First Nat. Bank* v. *Pomona Title Mfg. Co.,* 82 Cal.App.2d 592, 603 [186 P.2d 693]; 6 C.J.S., § 70, pp. 1121-1123.) Despite Civil Code section 1045, courts in California have continued to enforce assignments of contingent expectancies. (*Dougherty* v. *California Kettleman, etc.,* 9 Cal.2d 58, 89 [69 P.2d 155].)

In holding that the profit sharing agreement in the case at bench was enforceable only as an equitable assignment, the court relied upon *Bridge* v. *Kedon, supra,* 163 Cal. 493, 496, and *Kelly* v. *Kelly,* 11 Cal.2d 356, 364 [79 P.2d 1059, 119 A.L.R. 71]. *Bridge* involved an assignment of the expectancy of an heir and *Kelly* an assignment by a beneficiary of a spendthrift trust of the corpus of the trust. The transferor in those cases had nothing more than a hope of acquiring funds or property in the future with no present interest in the source of the expectancy. But the right of a landowner to profits from the sale of his land is more than naked hope; it is an expectancy based upon his present ownership of the land. As stated in 4 Pomeroy's Equity Jurisprudence, *supra,* at page 820: ". . . Of course, the mere hope of acquiring future property without any present source from which it may be obtained is neither an interest nor right, nor anything which has value or can be made the subject of legal relations. But when a party has entered into a contract or arrangement by the ordinary and legitimate and natural operation of which he will acquire property, his existing right thereunder is certainly not a *mere* naked hope; it is a possibility of acquiring property coupled with a legal interest in the contract." (Original italics.) Anticipated profits by a landowner from the sale of his land would thus appear to be an expectancy which would have been transferable at common law.

However, we need not pursue further the esoteric refinements of equitable assignments. In California the distinction between assignments of expectancies coupled with an interest and those which were formerly only enforceable in equity has largely been reduced to a matter of historical interest. (*H. S. Mann Corp.* v. *Moody,* 144 Cal.App.2d 310, 318 [301 P.2d 28]; 5 Cal.Jur.2d, Assignments, §§ 3, 5. See *Bridge* v. *Kedon, supra,* 163 Cal. 493, 497-498.) As stated in 5 California Jurisprudence, Second Edition, at page 375: "[T]he formal separation of courts of law and of

equity has never prevailed in California; a single court enforces the substantive law derived from both sources; and the modern rules of practice and procedure have largely eliminated the distinctions which were of great importance in determining and enforcing assigned rights in an earlier period. Also, the modern law of assignments under which the assignability of intangible rights is taken for granted in the business and commercial world is in large part entirely of equitable origin; few modern assignments would have been enforceable in the law courts which originally had exclusive jurisdiction to enforce the common law. . . ." (Fns. ommitted.)

Furthermore, the case at bench does not involve the validity of a present assignment of anticipated profits from the sale of the lands. We are not concerned with the question whether the claim of Connolly and Seward to profits from the land is entitled to priority over that of a creditor or other assignee of Latimer. The question before the court below was simply whether there was a valid profit sharing agreement according to normal contract principles. Agreements by landowners to share profits from the sale of their land in consideration of capital contribution or for services to be rendered have been held to be valid and enforceable according to their terms. (*Coward* v. *Clanton, supra,* 122 Cal. 451, 454; *Mulligan* v. *Wilson, supra,* 94 Cal.App.2d 286, 291. See *Bergson* v. *H. P. Hood & Sons,* 300 Mass. 340 [15 N.E.2d 196, 198, 116 A.L.R. 951]; *Hudson* v. *Wylie* (9th Cir.) 242 F.2d 435, 445.) There is no suggestion that the agreement in question was unfairly made or that it is against public policy. If it was supported by valuable consideration and otherwise satisfied the legal requirements for the formation of a contract, it was valid and enforceable according to its terms.

One of the crucial issues below was whether there was valuable consideration for the agreement. However, we cannot determine from the findings how that issue was resolved. In composing the findings, counsel for prevailing parties lifted verbatim from the judge's memorandum opinion his informal comments on the evidence. The formal findings of fact (¶ 22) recite: "CONNOLLY and SEWARD rendered services to decedent LATIMER in connection with 'The Agreement' limited to the following only:

"a) Decedent LATIMER was satisfied with the pending business relationship between himself, CONNOLLY and SEWARD wherein he was free to pursue his 'other' activities;

"b) CONNOLLY and SEWARD, after the October 6, 1964, Agreement, at Latimer's request or with his approval, did almost all the active work in their association in the real estate business;

"c) Decedent LATIMER relied upon CONNOLLY and SEWARD to actively promote his property and, in that connection, services rendered by CONNOLLY and SEWARD to decedent LATIMER relative to sales of decedent LATIMER's properties prior to October 6, 1964, may be persuasive as to the nature of the 'extraordinary' services to be rendered in the future;

"d) Decedent LATIMER relied upon CONNOLLY and SEWARD to promote the properties that are the subject matter of 'The Agreement.'

"Services rendered by CONNOLLY and SEWARD in connection with 'The Agreement,' are solely limited to the above. (Taken from Memorandum of Opinion, page 2, lines 5 through 14.)"

The "Conclusions of Law," state, inter alia, that Connolly and Seward "rendered 'adequate consideration' to decedent LATIMER in connection with 'The agreement,' limited to the following: . . .," the "following" being a repetition of the findings of fact pertaining to services rendered by Connolly and Seward.

The foregoing findings and conclusions on the issue of consideration lack the certainty essential to a proper review of the contentions of the parties. ■ Findings must be sufficiently definite and certain so that a reviewing court can arrive at a just determination of the merits of the appeal. (*Estate of Ramsey,* 107 Cal.App.2d 372, 374-375 [237 P.2d 20].) ■ Connolly and Seward contend the evidence establishes the existence of valuable consideration for the agreement whereas respondents, despite the court's "Conclusion" that there was "adequate consideration" to the extent "itemized" by the findings, urge that there was no evidence of valuable consideration.[7] The resolution of the competing contentions turns on the court's findings and whether they are supported by the evidence. However, it is impossible to determine whether or not the court found valuable consideration for the agreement. The findings fail to reveal what promises, if any, were given in exchange for the agreement, whether and to what extent the promises were performed. For example: What is the significance of the finding that "LATIMER was satisfied with the pending business relationship between himself, CONNOLLY and SEWARD wherein he was free to pursue his 'other' activities" and of the finding that after October 6, 1964 the two, at Latimer's request or with his approval "did almost all the active

---

[7]If there was "adequate consideration" to support an equitable assignment, it would seem necessarily to follow that there was valuable consideration at law. There is no requirement that consideration be adequate to make a contract enforceable at law. (*Blocksidge* v. *Broadway Sixth Co.,* 207 Cal.App.2d 628, 632 [24 Cal.Rptr. 622].) The term "good consideration" as used in Civil Code section 1605 is equivalent to "valuable consideration" and not adequate consideration in terms of monetary value. (*Horton* v. *Kyburz,* 53 Cal.2d 59, 65 [346 P.2d 399].)

work in their association in the real estate business"? Did the court intend, by those findings, to find that a consideration for the agreement was the implied promise to remain with Latimer and assume all responsibility for the operation of the real estate office? What is meant by the finding that services rendered to Latimer respecting the sale of decedent's properties prior to October 6, 1964 "may be persuasive as to the nature of the 'extraordinary' services to be rendered in the future"? Does the finding that "LATIMER relied upon CONNOLLY and SEWARD to promote the properties" mean that there was an implied promise on the part of Connolly and Seward to find a purchaser, ready, willing and able to buy at a price satisfactory to Kelber and Latimer, or merely to make a good faith effort to find buyers, or simply to perform such services as requested by Latimer in connection with the sale of the properties? A finding on a material issue which is fatally uncertain is equivalent to a failure to find. (4 Witkin, Cal. Procedure (2d ed. 1971) § 338, p. 3140.) The judgment must be reversed for lack of definite and certain findings on the issue of consideration.

In passing, we note that the judgment, in effect, decreed that Connolly and Seward are limited to a quantum meruit recovery for the reasonable value of services rendered to Latimer under the agreement. If the contract was void, voidable, or otherwise ineffective, recovery on a quantum meruit theory for reasonable value of services rendered thereunder might have been appropriate. (See *Brown* v. *Crown Gold Milling Co.,* 150 Cal. 376, 383 [89 P. 86] [employment contract void for uncertainty].) However, if, as the trial court concluded, the contract was enforceable as an equitable assignment, recovery may not be so limited. If the agreement was fairly made, was not against public policy, and was supported by valuable consideration, it would have been enforceable according to its terms. On the present state of the findings, we cannot uphold the judgment on a quantum meruit theory.

Although we have concluded that the judgment must be reversed for lack of proper findings on consideration, we shall discuss other contentions raised by the parties because they will no doubt arise on any retrial.

## VI

The trial court determined that Connolly's and Seward's interests under the profit sharing agreement can only be asserted as claims against the estate of Latimer when the properties are sold and profits realized. Connolly and Seward contend that Kelber should have been adjudged a trustee accountable to them for their share of the profits, subject to a lien for any sums the two may owe the estate. They contend the tral court erred in

concluding that Kelber incurred no responsibility as trustee or otherwise to carry out the terms of the profit sharing agreement.

The Bank (as administrator) and decedent's daughter concede, as they must, that since there was no indebtedness under the agreement during Latimer's lifetime, Connolly and Seward were not required to file creditors' claims. ■ The word "claim" 'in Probate Code section 707 refers to debts or demands against the decedent which might have been enforced against him during his lifetime by personal actions for the recovery of money and upon which only a money judgment could have been rendered. (*Newberger* v. *Rifkind,* 28 Cal.App.3d 1070, 1077 [104 Cal.Rptr. 663]; *Erickson* v. *Boothe,* 79 Cal.App.2d 266, 277 [179 P.2d 611].) They contend nevertheless that Connolly's and Seward's interests under the agreement were but contingent contractual claims assertible only against the estate after the contingency had occurred. They urge there was no evidence that Kelber agreed to hold himself accountable as trustee or otherwise to Connolly and Seward for their share of the net profits.

On the premise that the profit sharing agreement created a partnership or joint venture, Connolly and Seward contend that one-half the net profits from the sale of the properties would constitute partnership assets and not assets of the estate. (Corp. Code, § 15026; Prob. Code, § 571; *Estate of Grivel,* 10 Cal.2d 454, 456 [74 P.2d 759].) However, the trial court having rejected the premise upon which Connolly and Seward have constructed their argument and there being substantial evidence to support the trial court's implied findings, the argument advanced by them must fail.

It does not follow, however, that the trial court's conclusion that Connolly's and Seward's rights are only enforceable as claims against the estate is correct. The validity of the court's conclusion does not turn on whether a partnership or joint venture relationship existed between Latimer, Connolly and Seward, but rather may depend upon whether such a relationship existed between Kelber and Latimer. If Latimer was merely an equitable owner of an undivided half of the properties in question, his interest would clearly be a part of the estate and it would be the right and duty of the Bank as administrator to take possession, management and control of such interest. (Prob. Code, §§ 571, 581.)

If Kelber and Latimer were partners, no part of the properties would become assets of the estate. (Prob. Code, § 571.) If they were joint venturers, the same consequences would flow as if they were partners. ■ Rights and liabilities of joint venturers, as between themselves, are governed by the same principles which apply to a partnership. (*Zeibak* v. *Nasser,* 12 Cal.2d 1, 12 [82 P.2d 375].) ■ Statutory provisions gov-

erning the rights of partners upon dissolution of a partnership are applicable to joint ventures. (*Zeibak* v. *Nasser, supra.*) This extends to a dissolution of a joint venture by death of a joint venturer. (*Price* v. *Slawter,* 184 Cal.App.2d 715, 720 [7 Cal.Rptr. 830]. See *Estate of Peebles,* 27 Cal. App.3d 163, 167 [103 Cal.Rptr. 560].) Upon the death of a partner, the surviving partner is entitled to possession of the partnership property and is authorized to wind up the partnership business. (Corp. Code, § 15033; Prob. Code, § 571.) He must settle the partnership business expeditiously. (*Estate of Peebles, supra.*) The same powers and responsibilities extend to a surviving joint venturer. (*Estate of Peebles, supra.*)

In the case at bench there was evidence from which the court could have found that Kelber and Latimer were joint venturers. There was evidence of the existence of all of the incidents of a joint venture relationship, namely, joint interest in a business undertaking, an understanding as to the sharing of profits and losses, and a right of joint control. (*Holtz* v. *United Plumbing & Heating Co., supra,* 49 Cal.2d 501, 506-507.)

If Kelber and Latimer were joint venturers, no part of the real properties in question would constitute assets of the estate, although the value of Latimer's interest in the joint venture would be inventoried in his estate. Kelber would have been a trustee for the benefit of Latimer, not only because of written memoranda between the two, but because of their joint venture relationship. ▇▇▇ A joint venturer holding property for the venture is a trustee for his co-venturer. (*Epstein* v. *Stahl, supra,* 176 Cal.App.2d 53, 57.)

As to whether a trust relationship existed between Kelber and Connolly and Seward, there was evidence that immediately upon the execution of the profit sharing agreement, Mr. Latimer personally delivered a copy to Kelber. Kelber testified that upon being apprised of the profit sharing agreement, he (Kelber) understood he would be accountable to "two more people" for the profits from the sale of the properties. Kelber's testimony was as follows:

"Q. (By Mr. Schnabel:) When you got this copy of the contract of October 6th, 1964, you conceived that you as trustee were being advised that Charles Latimer had alienated some portion of his beneficial interest in this trust of which you were trustee; isn't that the fact?

"A. If I understand your question correctly, yes, that would be the fact.

"Q. Now there were two more people you'd have to make an appropriate accounting for in the division of profits; right?

"A. Yes.

"Q. All right. And did you ever question the legality of this October 6th, 1964 document?

"A. The legality?

"Q. Yes. Did you ever question the legality or did you deem yourself bound by it?

"A. I felt that I was bound by it, that there were—I had two new partners."

The foregoing evidence would have supported a finding that Kelber was a trustee not only for the benefit of Latimer but also for the benefit of Connolly and Seward as to their share of the profits under the terms of the profit sharing agreement, assuming the agreement to be enforceable. ▮▮▮ A trust may be created "where a trust already exists and at the direction of the beneficiary the trustee transfers the trust property upon a different trust, or the *beneficiary directs the trustee* to hold the property upon a different trust . . . ." (Rest.2d Trusts, § 17, com. h, p. 62; italics supplied.) ▮▮▮ A contingent interest can be held in trust. (Rest.2d Trusts, *supra,* § 85.) An expectancy based upon an existing contract may also be the subject of a trust. (Rest.2d Trusts, *supra,* § 86, com. e, p. 210.)

Of course, if the profit sharing agreement is determined to be void, voidable, or otherwise unenforceable for any reason and recovery is allowed on a quantum meruit theory, the claim could only be asserted as a claim against the estate. In such event it would be unnecessary to reach the question whether Kelber was a trustee for Connolly and Seward for their share of the profits under the profit sharing agreement.

## VI

▮▮▮ Although Connolly and Seward disclaim any interest in the lands by virtue of the profit sharing agreement, Mrs. Latimer contends the agreement constituted an invalid attempt by her husband to transfer, without her consent or joinder, an interest in community real property. She urges that under Civil Code section 5127[8] (formerly Civ. Code, § 172a) the agreement was invalid insofar as it purported to affect her community interest.

---

[8]Civil Code section 5127 (formerly § 172a) provides: ". . . [T]he husband has the management and control of the community real property, but the wife, either personally or by duly authorized agent, must join with him in executing any instrument by which such community real property or any interest therein is leased for a longer period than one year, or is sold, conveyed, or encumbered; provided, however, that nothing herein contained shall be construed to apply to a lease, mortgage, conveyance, or transfer of real property or of any interest in real property between husband and

The only authority cited by Mrs. Latimer is *Callahan* v. *Martin,* 3 Cal.2d 110 [43 P.2d 788, 101 A.L.R. 871], involving an assignment by a landowner of a percentage of the oil and gas extracted from his lands. The court held the assignment constituted a transfer of an interest in real property in the nature of "an incorporeal hereditament." *Callahan* turned on the nature of a landowner's rights to oil and gas beneath his land and is therefore inapposite.

While we have found no California case passing squarely upon the question whether a landowner's agreement to share profits from the sale of his land constitutes a transfer of an interest in real property, it has been held that an oral joint venture agreement concerning real property is not subject to the statute of frauds even though the real property was owned by one of the joint venturers. (*Gross* v. *Raeburn,* 219 Cal.App.2d 792, 796, 799 [33 Cal.Rptr. 432].) This view is generally shared in other jurisdictions. (2 Corbin, Contracts, § 411, pp. 418-421.) Corbin, *supra,* adds at page 421: ". . . There is even more reason for holding that a contract for the assignment of a share in the profits of a particular land speculation is not a contract for the sale of an interest in land; it is an assignment of a chose in action." (Fn. omitted.)

We conclude the agreement did not operate as a transfer of an interest in real property.

## VII

■■■ We next consider the question whether the trial court properly determined that Latimer's interest in the properties in question was community property. Although Connolly and Seward did not raise this issue in their opening brief, they raise it in their reply brief in response to the Bank's and daughter's contention that the judgment properly restricted enforceability of the profit sharing agreement as to Mrs. Latimer's community interest to the reasonable value of services rendered by Connolly

wife; provided, also, however, that the sole lease, contract, mortgage or deed of the husband, holding the record title to community real property, to a lessee, purchaser, or encumbrancer, in good faith without knowledge of the marriage relation shall be presumed to be valid. No action to avoid any instrument mentioned in this section, affecting any property standing of record in the name of the husband alone, executed by the husband alone, shall be commenced after the expiration of one year from the filing for record of such instrument in the recorder's office in the county in which the land is situate, and no action to avoid any instrument mentioned in this section, affecting any property standing of record in the name of the husband alone, which was executed by the husband alone and filed for record prior to the time this act takes effect, in the recorder's office in the county in which the land is situate, shall be commenced after the expiration of one year from the date on which this act takes effect."

and Seward to the community and in response to the wife's contention that the agreement was wholly unenforceable as to her community interest.

The properties having been acquired by purchase during Latimer's marriage, his interest was presumed to be community, and the burden of overcoming the presumption by clear and convincing evidence rested with Connolly and Seward. (*See* v. *See,* 64 Cal.2d 778, 783 [51 Cal.Rptr. 888, 415 P.2d 776].)

Insofar as the 7th and Mountain property was concerned, the evidence supported the trial court's finding that Latimer's interest was community property. The property was acquired with proceeds of an unsecured loan from the United California Bank evidenced by a promissory note signed by Latimer and Kelber. The Bank's loan officer testified the loan was made solely in reliance upon the personal credit of Kelber and Latimer. ▇ The proceeds of the loan so made on the personal credit of either spouse are regarded as community property, particularly where the husband is the borrower. (*Ford* v. *Ford,* 276 Cal.App.2d 9, 13 [80 Cal.Rptr. 435]; 4 Witkin, Summary of Cal. Law (7th ed. 1960) pp. 2727-2728, and cases there cited.)

As to the airport property, its acquisition was financed by a $420,000 loan secured by the property itself and a $360,000 loan secured by the Alta Loma property. The loan proceeds secured by the airport property were obviously community in nature. As to the $360,000 loan, it was conceded that Latimer's interest in the Alta Loma property was his separate property. Ordinarily funds borrowed by hypothecation of a spouse's separate property are also separate property. (*Estate of Abdale,* 28 Cal.2d 587, 592 [170 P.2d 918].) ▇ In the case at bench, however, the court found that although the Bank took trust deeds on both the airport property and the Alta Loma property, the loans were made "primarily" on the general credit of Kelber and Latimer. The Bank's loan officer testified the additional security on the Alta Loma property was taken only to comply with banking regulations restricting banks to a loan of up to 60 percent of the appraised value of property given as security. He also testified that in making the loans the Bank relied primarily on the general credit of Kelber and Latimer and not on the additional security of the Alta Loma property.

The foregoing evidence was sufficient to support the trial court's finding that Latimer's interest in the airport property was community. ▇ There is a rebuttable presumption that property acquired on credit during marriage is community so that "[i]n the absence of evidence tending to prove that the seller [in this case the lendor] primarily relied upon

the purchaser's separate property in extending credit, the trial court must find in accordance with the presumption." (*Gudelj* v. *Gudelj,* 41 Cal.2d 202, 210 [259 P.2d 656].)

 For the first time in their reply brief, Connolly and Seward urge that an agreement entered into between the Latimers on August 25, 1964, a copy of which was introduced into evidence, changed the character of the properties from community to separate. The agreement, the text of which is set out in the margin below,[9] provides in substance that as to "any . . . purchasers or encumbrancers" property standing in his or her name alone shall be "conclusively presumed to be his [or her] own." As between the parties, however, the agreement does not purport to change the character of property held by either spouse. Moreover, Connolly and Seward were neither "purchasers" nor "encumbrancers." The agreement, therefore, did not compel a finding that Latimer's interest in the two properties was his separate property.

The question remains as to the effect, if any, of the profit sharing agreement upon the wife's community interest. We have heretofore determined that the wife's contention that the profit sharing agreement was unenforceable against her community property interest because it constituted an attempted transfer of interest in community real property cannot be sustained.

---

[9]"AGREEMENT

"THIS AGREEMENT made and entered into at Ontario, California, this 25th day of ~~September~~ August 1964, by and between MILDRED L. LATIMER, wife, and CHARLES R. LATIMER, husband;

"WITNESSETH:

"WHEREAS each of the parties desires to be able to convey, encumber, and in all respects deal with any property that may be now owned or that may be hereafter acquired by either of them, in her or his own name, without the necessity of the other being a necessary party to any instrument conveying, encumbering, or otherwise affecting such property;

"Now THEREFORE it is mutually agreed:

"I. Each of the parties hereby declares that this agreement is freely and voluntarily made, with a clear and full understanding of the entire transaction, each with independent advice, and without duress, menace or undue influence whatsoever.

"II. That said CHARLES R. LATIMER hereby declares and agrees that all property heretofore or hereafter acquired by and standing in the name of MILDRED L. LATIMER alone is and shall be conclusively presumed to be her own as to any and all purchasers or encumbrancers whatsoever.

"III. The said MILDRED L. LATIMER hereby declares and agrees that all property heretofore or hereafter acquired by and standing in the name of CHARLES R. LATIMER alone is and shall be conclusively presumed to be his own as to any and all purchasers or encumbrancers whatsoever.

"IN TESTIMONY WHEREOF the parties have hereunto set their hands and seals the date and at the place first above written.

"/s/ Mildred L. Latimer

"/s/ Charles R. Latimer"

This leaves the question whether the profit sharing agreement constituted an improper disposition of community personal property. ▮ Although the husband may dispose of community personal property, he cannot make a gift of such property or dispose of it without "valuable consideration." (Civ. Code, § 5125 [formerly Civ. Code, § 172].) A gift made by a husband in violation of Civil Code section 5125 is voidable in its entirety during the husband's lifetime and to the extent of only one-half after his death. (*Ballinger* v. *Ballinger*, 9 Cal.2d 330, 334 [70 P.2d 629]; *Britton* v. *Hammell*, 4 Cal.2d 690, 691 [52 P.2d 221]; *Trimble* v. *Trimble*, 219 Cal. 340, 344 [26 P.2d 477]; *Fields* v. *Michael*, 91 Cal.App.2d 443, 448 [205 P.2d 402].)

Respondents urge that the position of a husband in dealing with community property is that of a fiduciary (*Vai* v. *Bank of America*, 56 Cal.2d 329, 338 [15 Cal.Rptr. 71, 364 P.2d 247]), and that therefore any transfer, sale or disposition of community property must be for an "adequate consideration" substantially equal in value, measured in terms of money, to the value of the property. The only cases cited in support of their contention are *Frey* v. *Clifford*, 44 Cal. 335 and *Clark* v. *Troy*, 20 Cal. 219. Those cases had nothing to do with a husband's disposition of community property. Although they held that there was a distinction between "good consideration" and "valuable consideration," the latter being "money or the like," that distinction has since been repudiated. "Good consideration" and "valuable consideration" mean the same thing. (*Horton* v. *Kyburz, supra*, 53 Cal.2d 59, 65.)

Although in negotiating a property settlement with his wife with respect to community property, a husband has the duties of a fiduciary (*Vai* v. *Bank of America, supra*, 56 Cal.2d 329, 338; *Flores* v. *Arroyo*, 56 Cal.2d 492, 494-495 [15 Cal.Rptr. 87, 364 P.2d 263]), those duties have not been extended to all of the husband's business dealings with community property. (See Note, *The Husband's Fiduciary Duty—More Protection for the California Wife*, 14 Stan.L.Rev. 587.) Respondents' contention that community property should not be disposed of by the husband except for *adequate consideration* finds no support in the decisions. Civil Code section 5125 has never been so construed. The cases equate "valuable consideration" as used in section 5125 with "good consideration" as used in section 1605. (*Gantner* v. *Johnson*, 274 Cal.App.2d 869, 877 [79 Cal.Rptr. 381]; *Estate of Bray*, 230 Cal.App.2d 136, 141 [40 Cal.Rptr. 750]. See *Grolemund* v. *Cafferata*, 17 Cal.2d 679, 683 [111 P.2d 641]; *Metzger* v. *Vestal*, 2 Cal.2d 517, 522 [42 P.2d 67].) As one note writer has observed: "Evidently a husband is free to make unwise purchases, to speculate freely in stocks and securities or to use personal property foolishly without the wife's consent,

for in these situations the desirability of freely transferable personal property is thought to outweigh the harm suffered by the wife." (Note, 9 Stan. L.Rev. 400, 404-405.) To extend the "fiduciary duty" concept to situations other than property settlements with the wife would, as another commentator has stated, "hamper the exercise of his [husband's] business initiative, prejudice the rights of those who deal with him, and generally hinder commercial transactions. . . ." (14 Stan.L.Rev., *supra,* pp. 598-599; fns. omitted.)

If there was valuable consideration and if the profit sharing agreement is enforceable according to its terms, it would be enforceable not only as to Latimer's community interest but to the wife's as well.

Judgment is reversed.

Gardner, P. J., and Gabbert, J., concurred.

A petition for a rehearing was denied January 15, 1974, and the petition of respondent Latimer for a hearing by the Supreme Court was denied February 27, 1974.